[No. G017258. Fourth Dist., Div. Three. Mar. 31, 1995.]

ROBIN V., Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
ORANGE COUNTY SOCIAL SERVICES AGENCY, Real Party in
Interest.

1160

## COUNSEL

Ronald Y. Butler, Public Defender, Carl C. Holmes, Chief Deputy Public Defender, Loel Jones, Deputy Public Defender, and Carol E. Lavacot for Petitioner.

No appearance for Respondent.

Terry C. Andrus, County Counsel, and Yasmin Kamkar, Deputy County Counsel, for Real Party in Interest.

Harold La Flamme and Jess Ann Hite, under appointments by the Court of Appeal, for Minor.

## OPINION

SONENSHINE, Acting P. J.—Robin V., the father of Destiny V., petitions for a writ of mandate under the newly enacted procedures.[1] We grant the petition, noting this case presents a classic example of the need for immediate appellate relief from an erroneous order, the harm of which can only increase the longer it remains uncorrected.

---

[1]Under *In re Matthew C.* (1993) 6 Cal.4th 386 [24 Cal.Rptr.2d 765, 862 P.2d 765], a birth parent or other aggrieved party could wait until an appeal from a judgment terminating parental rights or adopting some other permanent plan to seek review of the juvenile court's

I

Destiny V. was born to Jolie B. on July 29, 1992, with a positive drug screen. Her father, Robin, who had a long history of criminal conduct, arrests and incarcerations,[2] was out on bail on a firearms charge at the time. He attended the birth and then jumped bail, moving to Las Vegas with Jolie and Destiny. A short time later, he apparently had a change of heart and voluntarily returned to California to serve a two-year sentence at Tehachapi. That was where he was in December 1993, when he learned Destiny had been abandoned by her mother and was the subject of dependency proceedings. Robin immediately advised the Orange County Social Services Agency (SSA) he wanted custody of the child.

Robin's reunification plan stated he would be considered for placement of the minor upon his release and after his completion of certain requirements. Inter alia, he had to: (1) inquire at the correctional facility about available services such as "substance abuse counseling, Narcotics Anonymous, Alcoholics Anonymous, vocational training and parenting classes"; (2) enroll in all programs available and, if unavailable, "seek hardship and good conduct transfers to obtain such services"; (3) maintain monthly contact with the social worker, in person, by telephone or by mail; and (4) upon his release, remain drug free and conviction free, comply with the requirements of

---

referral order. The Legislature abrogated the *Matthew C.* holding with the enactment of Welfare and Institutions Code section 366.26, subdivision (*l*)(1)(C), which provides that referral orders entered after January 1, 1995, may *not* be reviewed via appeal unless a timely writ petition has been filed and either "summarily denied or otherwise not decided on the merits." (See Cal. Rules of Court, rules 39.1A(b)(2), 39.1B(d)(2), 39.2(b)(2) and 1436.5(c)(2).) The appellate courts are "[e]ncourage[d] . . . to determine all writ petitions filed pursuant to this subdivision on their merits." (Welf. & Inst. Code, § 366.26, subd. (*l*)(4)(B).) To this end, the Judicial Council has promulgated rule 39.1B(m) which provides, "Absent exceptional circumstances the appellate court shall review the petition for extraordinary writ and decide it on the merits."

All statutory references are to the Welfare and Institutions Code.

[2] Robin's first arrest in March 1979 was for burglary; as a juvenile, he was counseled and released. Disposition of a petty theft arrest in 1982 is unknown; a grand theft property arrest in February 1983 was dismissed in the interests of justice. He was convicted of a misdemeanor burglary in March 1983, served a 30-day jail sentence and was put on probation for 3 years. Grand theft auto in June resulted in incarceration in a California Youth Authority facility until Robin's parole on January 17, 1985. That same day, there was another misdemeanor burglary and a parole violation, for which he served a 30-day sentence and was given another 3-year probation. In August 1985, Robin was convicted of a felony burglary and sentenced to 16 months in prison. He was paroled in May 1986, but 6 months later served 30 days for receiving stolen property and possession of a hypodermic syringe. In December, he was placed in custody in the Chino facility for parole violation. He served additional time there for possession of illegal drugs and giving false information to a police officer. He was sentenced to 120 days in jail in February 1990 for petty theft and violation of probation. He was paroled in June, then briefly reincarcerated in July and paroled again in August.

parole or probation, enroll in and complete a parent education class, and maintain a suitable and stable home and a sufficient verifiable legal source of income for at least three months prior to a decision regarding return of the minor. Finally, Robin was to "inform the assigned social worker of any difficulties in completing the service plan as soon as they occur, so as to allow the assigned social worker the opportunity to assist the minor's father to find ways to overcome said difficulties." The social worker was to assist Robin in obtaining programs "in keeping with the rules of the facility." Visitation in prison was deemed detrimental due to Destiny's age (then 18 months) and the lack of a relationship between her and Robin.

In a court report filed June 17, 1994, the social worker noted the father's record of progress. He: (1) "successfully attend[ed] the Narcotics Anonymous program at Tehachapi . . . since November 1, 1993;" (2) "[r]equested a hardship transfer due to the unavailability of substance abuse counseling, vocational training and parenting classes"; (3) notified the SSA the requested services were not available after inquiry; (4) maintained monthly contact with the social worker; (5) requested referrals to drug treatment programs to be entered upon release; (6) asked the social worker to obtain his birth certificate so he could apply for a social security number; (7) sent letters through the social worker to the minor's caretakers; and (8) sent a photograph and letter to Destiny. Although the social worker reported the father's cooperation with the service plan as "Further progress needed," she added, "[Robin] has participated in every case plan activity he can do while in prison. He has indicated he intends to continue to participate in the case plan activities after he is released from prison. The father says he has sent his resume out to several prospective employers and is making plans for a place to live. He said he wants to visit with the minor as soon as possible after his release." The social worker also noted, "Because of [Robin's] criminal and drug abuse history, there is some concern about [his] ability and desire to provide for the physical, mental and emotional needs of the minor. [He] has demonstrated his willingness to comply with the Court-directed case plan by participating in every activity it is possible for him to do while incarcerated. After his release from prison, [Robin] will have to continue to show his commitment to reunification with the minor by developing an appropriate parent-child relationship with the minor, and establishing a suitable, safe and stable home. [He] will have to sustain his sobriety, remain conviction free and maintain a legal, verifiable source of income." The report contained an outline of the social worker's responsibilities, notably, reviewing the case plan with Robin, providing him "referrals to appropriate resources to facilitate . . . compliance with the case plan," contacting the service-providing agencies to monitor Robin's progress in counseling and drug rehabilitation, and visiting Robin "a minimum of once each month."

Robin was released on June 26. He was out of prison long enough to attend the six-month review hearing on June 29, when the court ordered another six months of services and monitored weekly visitation with Destiny. Robin arranged a visit with the minor, but was unable to complete it: On July 5, his wife reported him for taking a vehicle without her permission. He was detained for a parole violation and, on July 26, was sent to the Chino prison facility. During his all-too-brief (11 days) interlude out of custody, he did not participate in any services. He advised the SSA he had undergone one drug test, but did not provide any verification.

The first social worker had been replaced by another (whom we shall call D. for convenience of reference) in late May. D. had only one face-to-face contact with Robin—on August 18, when Robin signed his amended service plan.[3] During the six months of his incarceration until January 31, 1995, she sent him two letters and never phoned him. For his part, Robin wrote to D. each month when he sent letters to his child. He called D. a number of times, leaving messages on her recording machine. Although he did not know whether he had a right to visitation in prison, he asked D. to arrange one. She said she would "look into it," but never got back to him; Robin made no further inquiry. He requested D. to provide him with pamphlets on parenting, but she "did not have access" to pamphlets and did not believe the facility would allow her to send books directly to the prisoner. She never responded to Robin's request in this regard. During his incarceration, Robin worked in the prison hospital from 2 to 10 in the evening, five days a week, with rotating days off. He had no control over his work schedule and, because of it, he was unable to participate in Chino's parenting classes. He attended "maybe half a dozen" Alcoholics Anonymous (AA) meetings when his work schedule facilitated his participation.

Robin was out of custody and appeared at the February 3, 1995, 12-month review hearing. The court found the SSA had provided reasonable services,

---

[3]The revised plan provided, inter alia, "father will successfully complete [an] . . . approved drug treatment program which is to include random, observed drug testing. . . . Treatment is to continue until the assigned social worker determines in consultation with the drug treatment counselor that treatment is no longer necessary"; "father . . . [is to] follow all recommendations of the parole officer and not engage in any acts which may result in being incarcerated"; "father will not participate in criminal activities"; "Upon release from incarceration, the minor's father will immediately contact the assigned social worker to provide current address and obtain referrals for required services"; "father will keep the assigned social worker informed of pertinent changes, including but not limited to, current address, telephone number, monthly income, legal source of income, household composition, and arrests within 48 hours of said changes"; and "father will inform the assigned social worker of any difficulties in completing the case plan as soon as they occur so as to allow the assigned social worker the opportunity to assist the minor's parents in finding ways to overcome said difficulties."

noting "if there's any failure, it would only be in the lack of that one visit [requested by Robin] and the failure of father to participate in what he could do and the failure of the system in state prison to provide drug rehab and so on. But I find no failure of [SSA] to act on information or to take steps that they could take." Turning to the issue of substantial probability of Destiny's return to parental custody, the court noted the father "could [drug] test significantly" during the time remaining, "might" be able to complete a parenting classs, and, judging from his testimony, may have "come out of prison a new man." Nonetheless, the court stated, Robin had "arrived [at the hearing] with a failure to complete any component of the plan," and it "would be ludicrous" to find he could complete the plan in three months. It terminated reunification services, finding "there has not been substantial compliance with the service plan . . . and the likely date by which the minor may be placed for legal guardianship or adoption is June 1st." Referring the matter for a section 366.26 hearing, the court observed that if Robin some- how managed to make significant progress in the interim, his remedy would be to file a section 388 petition.

## II

Section 366.21, subdivision (f) provides that in determining whether return of custody to the parent "would create a substantial risk of detriment" to the child, the court must consider "whether reasonable services have been provided" and whether the parent has "cooperated and availed himself or herself of services provided." Reasonable services include reunification services. (*Cynthia D.* v. *Superior Court* (1993) 5 Cal.4th 242, 249 [19 Cal.Rptr.2d 698, 851 P.2d 1307].) Such services are limited to 12 months, but may be extended to an outside time limit of 18 months "if it can be shown that the objectives of the service plan can be achieved within the extended time period." (§ 361.5, subd. (a).)

The adequacy of reunification plans and the reasonableness of the SSA's efforts are judged according to the circumstances of each case. (*In re Edward C.* (1981) 126 Cal.App.3d 193, 205 [178 Cal.Rptr. 694] [A plan "must be appropriate for each family and be based on the unique facts relating to that family"].) Moreover, the SSA must make "[a] good faith effort to develop and implement a family reunification plan." (*In re Kristin W.* (1990) 222 Cal.App.3d 234, 254 [271 Cal.Rptr. 629].) Courts may not initiate proceedings to terminate parental rights unless they find adequate reunification services were provided to the parents, even when the parents are incarcerated. (See *In re Brittany S.* (1993) 17 Cal.App.4th 1399 [22 Cal.Rptr.2d 50].) "The effort must be made to provide suitable services, in spite of the difficulties of doing so or the prospects of success." (*In re Dino*

*E.* (1992) 6 Cal.App.4th 1768, 1777 [8 Cal.Rptr.2d 416].) "[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult (such as helping to provide transportation and offering more intensive rehabilitation services where others have failed)." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414 [286 Cal.Rptr. 592], original italics.) Only where there is clear and convincing evidence the SSA has provided or offered reasonable services may the court order a section 366.26 hearing. (§ 366.21, subds. (g)(1) and (g)(3).)

In *In re Brittany S., supra,* 17 Cal.App.4th 1399, a different panel of this court, analyzing the issue of what constitutes reasonable and adequate reunification services for incarcerated parents, stated, "The issue is important because reunification services are a major component of the 'service plan,' and a parent's failure to comply with the service plan almost invariably leads to termination of parental rights. If a parent cannot avail himself or herself of reunification services because of incarceration, it is a fait accompli that the parent will fail to comply with the service plan. . . . While 'use a gun, go to prison' may well be an appropriate legal maxim, 'go to prison, lose your child' is not." (*In re Brittany S., supra,* 17 Cal.App.4th at p. 1402.)

 The reunification services provided to the incarcerated father in this case do not measure up to the established standards. D. provided the father with some stamped envelopes so he could mail letters to his daughter, period. Robin requested a visit with Destiny. D.'s failure to find out whether the visit could take place, to arrange the visit or even to get back to Robin was unreasonable. Moreover, her interpretation of Robin's failure to repeat his request as a lack of "follow through" was unfair. How could he possibly know he was being tested and was expected to ask more than once?

Robin requested parenting materials, albeit he used the wrong word in asking for "pamphlets." D.'s failure to respond—because she did not have *pamphlets* and did not know (and did not ask) whether *books* were acceptable—was unreasonable.

Robin wrote six letters to his social worker; D. wrote two, simply asking the father what he was involved in. Other than at the August 1994 meeting when Robin signed his service plan—which was the first and last time of any face-to-face contact with D.—the social worker apparently never reviewed his plan with him or gave him advice on programs he could or should be doing to secure his parental rights.

Robin called prior to the February 1995 review hearing, requesting a visit with Destiny. As of the time of the hearing, D. had made no arrangement for a visit.

There is insufficient evidence the SSA offered or provided adequate reunification services. (See *In re Walter P.* (1991) 228 Cal.App.3d 113, 129 [278 Cal.Rptr. 602].) Indeed, there is virtually no showing the SSA "offered services designed to remedy [the problems leading to Destiny's dependency], maintained *reasonable* contact with [Robin] during the course of the service plan, and made *reasonable* efforts to assist [him] in areas where compliance proved difficult." (*In re Riva M.*, *supra*, 235 Cal.App.3d 403, 414, original italics.) The court's referral order constitutes a manifest abuse of discretion.

■ We cannot say the error was harmless. (Cal. Const., art. VI, § 13.) Reasonable reunification services may well have made a difference with *this* father who, from the first day to the last, expressed his desire to take custody of his daughter, who for at least the first six months did everything possible to achieve his goal and who, during the second six months, tried unsuccessfully to get the attention of the SSA. A single parent/child visit could have been a building block for other visits and the establishment of an important relationship. (See, e.g., *In re Terry E.* (1986) 180 Cal.App.3d 932, 948 [225 Cal.Rptr. 803] [where the court noted if the mother had been given any help in maintaining contact with her children, "she probably would have a good relationship with her children today."].) Had D. responded to Robin's request for parenting materials, either by providing a book through authorized channels or by advising him she had no access to such materials and to look elsewhere, he might have done so. Had D. discussed with Robin the serious jeopardy to his parental rights posed by his nonattendance at parenting classes, perhaps he could have found work options accommodating such classes. In short, had D. tailored the services to meet Robin's needs, he might have had a far better record of progress on which to stake his custody claim.[4]

It has been stated, "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services . . . were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547 [3 Cal.Rptr.2d 217].) In finding Robin's services unreasonable, we do not suggest the SSA had to take him by the hand or lead him step-by-step

---

[4]We note Robin was without any family support system and had been since adolescence. The social worker was the only resource he had.

along the way. (See *In re Christina L.* (1992) 3 Cal.App.4th 404, 414-415 [4 Cal.Rptr.2d 680].) But neither was it free to hang him out to dry. It appears Robin's cardinal sin was his reincarceration, leading to speculation he could not stay out of prison long enough to be a parent. Even assuming he could have done more for himself, the issue is whether the SSA gave him the services to which he was entitled. It did not. The court abused its discretion in finding there had been reasonable reunification services. A section 388 motion by Robin in the future is not an adequate remedy because it would place on him the burden which belongs to the SSA. (*In re Michael B.* (1992) 8 Cal.App.4th 1698, 1703 [11 Cal.Rptr.2d 290].)

The only remaining question is how long Robin is entitled to reunification services. Although the erroneous order terminating his services did not issue until February 3, 1995, the SSA provided inadequate services at least from June 1994, a time roughly coinciding with the six-month review hearing.[5] Therefore, when the remittitur issues, the case will resume its six-month status.

The petition for writ is granted. The juvenile court is directed to vacate its order for a section 366.26 hearing and to enter a new and different order, resuming the six-month status of the case and providing Robin with additional reunification services comporting with this decision.

Crosby, J., and Wallin, J., concurred.

---

[5]Fortunately, through this new writ procedure, we can grant meaningful relief. Had Robin been required to wait for review until an appeal ran its course, he and the minor likely would have been locked into separate worlds.