Filed 1/7/15  Jessica T. v. Super. Ct. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| JESSICA T., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF DEL NORTE COUNTY, <br><br> Respondent; <br><br> DEL NORTE COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> Real Party in Interest. | A143444 <br><br> (Del Norte County Super. Ct. Nos. JVSQ 12-6149, JVSQ 12-6150 & JVSQ 12-6151) |

In this juvenile writ proceeding, Jessica T. (mother) seeks extraordinary relief from the juvenile court order terminating reunification services with respect to her three children—C. T. (born April 2007), S.T. (born September 2008), and T. T. (born November 2011)—and setting a permanency planning hearing pursuant to section 366.26 of the Welfare and Institutions Code.[1]  Mother's narrative pro per petitions contain a host of allegations without citation to the record and do not clearly set forth her stated grounds for relief.  Nevertheless, we conclude that the gist of mother's complaint is that the juvenile court erred in finding that she received reasonable reunification services.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.  All rule references are to the California Rules of Court.

1

Having reviewed the record in these matters, we see no error requiring reversal of the juvenile court's setting order and therefore deny the petitions.

## I. BACKGROUND

The Del Norte County Department of Health and Human Services (Department) initially offered voluntary family maintenance services to this family pursuant to section 301 in September 2012 due to ongoing incidents of domestic violence between mother and Matthew T. (father).[2]  Services offered included domestic violence education, parenting education, and referrals for all three children for developmental assessments and counseling.  The Department also provided a dumpster to assist the parents in removing garbage from their garage.

However, noting that the institution of voluntary services had been ineffective in mitigating the family's problems, the Department subsequently detained all three minors on September 24, 2012, after father was arrested for stabbing mother with a kitchen knife in the presence of the children.  According to mother, the stabbing was preceded by an incident in which father choked her to unconsciousness.  In petitions filed the next day, the Department highlighted mother and father's chronic history of domestic violence and also indicated that the parents' substance abuse put the minors at risk.  According to the Department, both parents admitted to marijuana use and mother admitted to recent methamphetamine use.  In its detention report, the Department also indicated that the parents were not meeting the minors' medical needs, having failed to notice that both

---

[2] Matthew T. was married to mother and they were an intact family at the beginning of these proceedings.  He is the biological father of all three children.  He has not filed for writ relief in these matters and is therefore not a party herein.

Section 301 provides in relevant part:  "In any case in which a social worker, after investigation of an application for petition or other investigation he or she is authorized to make, determines that a child is within the jurisdiction of the juvenile court or will probably soon be within that jurisdiction, the social worker may, in lieu of filing a petition or subsequent to dismissal of a petition already filed, and with consent of the child's parent or guardian, undertake a program of supervision of the child.  If a program of supervision is undertaken, the social worker shall attempt to ameliorate the situation which brings the child within, or creates the probability that the child will be within, the jurisdiction of Section 300 . . . ."

boys were suffering from asthmatic symptoms and the younger boy had a significant yeast infection.

At the detention hearing on September 26, 2012, the minors were formally detained in foster care. Thereafter, on October 5, 2012, both parents submitted to jurisdiction, and the juvenile court found that all three children were described by subdivision (b) of section 300. The minors remained placed together in a licensed foster home.

In its dispositional report filed with the court on October 31, 2012, the Department detailed several problem areas for the family which required intervention. With respect to mother, the Department specifically identified ongoing concerns with domestic violence, substance abuse, and understanding the impact her choices and environment have on her children. The Department recommended family reunification services to deal with these issues. It further stated that both parents were currently doing well with visitation and engaging in services; this despite the fact that mother was struggling with some health issues.

A dispositional hearing was held on November 2, 2012. At that time, both parents submitted the matter, the juvenile court declared the minors to be juvenile court dependants, and the minors were formally removed from the custody of their parents. In addition, the court ordered both mother and father to comply with their proposed reunification case plans. For mother, this included: (1) continued participation in a domestic violence program; (2) continued participation in drug treatment as recommended by her drug counselors; (3) random drug testing; (4) participation in a parenting program; (5) cooperation with the Linkages program to maintain employment and eligibility for government benefits; and (6) visitation. A six-month review was set for May 2013.

On November 30, 2012, the juvenile court authorized overnight visitation for the minors with their parents, subject to the parents' ability to secure housing. Thereafter, the Department sought an interim court review in February 2013, requesting that the juvenile court order placement of the minors back in the home of their parents.

3

According to the Department, mother had graduated from her parenting program, was expected to complete her domestic violence program prior to the requested court hearing, continued to participate in substance abuse treatment, consistently tested negative for drugs, maintained employment at a fast food restaurant, and cooperated with the Linkages program to maintain eligibility for benefits. In addition, both parents remained involved in their children's medical care and education. It was the Department's opinion that the minors would be safe if returned home. On February 22, 2013, the juvenile court expressed some concerns regarding father's compliance with his reunification plan, and thus the matters were continued for a further progress report.

On March 15, 2013, after receiving additional information, the juvenile court adopted the Department's recommendation, returning the minors to the home of their parents. Mother was ordered to complete her domestic violence program and continue to participate in substance abuse treatment and the Linkages program. A referral was made for respite care, and the court was informed that mother's health had improved.

At the 6-month review hearing on April 26, 2013, the Department recommended that the minors remain in the home of their parents. Although mother and father reportedly still had trouble getting along, both were employed, were cooperative with the Department, and were providing negative drug tests. Other than T.T.'s frequent vomiting and upcoming surgery to have tubes put in his ears, no issues were reported with respect to the children. The two older children were attending weekly individual counseling and were reported to be doing well in school. However, the father had experienced "a couple" of relapses, and the parents continued to argue in front of the children. The Department believed the parents needed its continued support to maintain a home free of violence and substance abuse. The juvenile court adopted the Department's recommendation and ordered services for mother which included continued cooperation with the Linkages program, continued participation in substance abuse treatment, continued drug testing, and a further assessment to determine whether she would benefit from more intensive domestic violence services. The Department was requested to look into the possibility of couples counseling for the parents. On May 31, 2013, the

4

Department reported that it had located marriage counseling for mother and father through a local church as it was otherwise unavailable in the county, and the parents both indicated a willingness to attend. The court confirmed October 25, 2013, as the date for the next six-month review.

In its October 2013 status review report, the Department disclosed that, after a July 2013 domestic violence incident, father was no longer living with the family. According to the report, father had been arrested on charges involving domestic violence on four additional occasions between July and October. Mother was unemployed, but had recently begun an eight week Certified Nurse Assistant (CNA) program. She had been evicted for nonpayment of rent and was living with the minors in the home of a paternal great-aunt and uncle. Further, although mother graduated from the second phase of her drug treatment program, she was currently inconsistent in her attendance. She had tested positive for marijuana seven times since the last court review.

Moreover, during this reporting period, all three minors were showing signs of distress. T.T. had been seen twice for respiratory problems at the University of California San Francisco Medical Center (UCSF), and it was determined that he would need to be on an inhaled steroid for life and would require surgery. He was also going through an intense biting phase. C.T., for his part, was reported to be hearing voices, having trouble sleeping, and having behavior and attention issues at school. He was seen by a psychiatrist, who diagnosed ADHD and prescribed medication. S.T. was engaging in calculated behavior designed to make her look like the "good girl" at C.T.'s expense. C.T. and S.T. continued to participate in individual therapy.

Mother was requesting that dependency be dismissed. In the opinion of the Department, however, the parents were not ready to safely parent their children without court supervision and continued involvement by the Department. Indeed, the Department recommended that the minors remain in mother's care solely because they were living with the paternal great-aunt and uncle in a stable, drug-free environment. At the October 25, 2013, review hearing, the juvenile court adopted the recommendations of the Department, continuing the minors in their in-home placement. Mother was required to

5

cooperate with the Linkages program, re-engage in drug treatment, and continue to drug test on request. A further review hearing was set for April 2014.

By January 2014, however, the Department felt enough unease about the minors' continued placement with their mother that it filed an interim report with the juvenile court. In this report, the Department detailed multiple concerns regarding the minors' overall emotional and physical health. C.T.'s teacher, for instance, reported that the minor continued to have school tantrums; that his stutter had grown worse despite participation in speech therapy; that his homework was not being consistently turned in; and that, due to his excessive weight, he was often unable or unwilling to engage in activities requiring him to move. C.T. stated that his psychotropic medication helped him to behave better, although he was still having scary dreams and hearing voices. According to the minor, when he doesn't take his medication, "he is bad and he doesn't know why but he can't control himself." Despite this fact, mother failed to attend a scheduled appointment with C.T.'s psychiatrist and did not reschedule in a timely manner, thereby compromising C.T.'s medication supply.

S.T., for her part, was reported by her teacher to be doing fairly well academically in kindergarten. Recently, however, she had been falling apart emotionally at school, crying and upset. Notably, neither S.T. nor C.T. had been seeing their mental health counselor on a consistent basis. Further and of significant concern, two-year old T.T had missed appointments at UCSF in October and November 2013 to address his serious health issues. And, mother had failed to reschedule, despite the fact that the Department had offered her financial assistance to make the trip. In addition, T.T., a child with pulmonary issues, had recently tested positive for marijuana in hair follicle testing.

The Department also reported that both parents had ceased to participate in substance abuse treatment, despite the fact that mother's groups could have been arranged so as not to interfere with her CNA training.[3] The parents had only drug tested once since the October 2013 six-month review, with father testing positive for marijuana

---

[3] Mother claimed that she was finished with substance abuse treatment, but was not able to provide a certificate of completion.

on December 23, 2013, and mother testing positive for both methamphetamine and marijuana on December 4. In addition, mother was unable to provide a sample on December 23, 2013, and asked to return later, but failed to do so. Mother also did not test when referred on January 10, 2014.

Finally, it was unclear to what extent father—who had been arrested repeatedly on domestic violence and substance abuse-related charges—remained a member of the household. Although mother claimed that she was "done" with father after a November 2013 domestic violence incident and stated that he did not live in the home, the Department was aware that father was in the home during Christmas week and mother further admitted in January that father was helping out with the children and was in the home after school when C.T. got off the bus. In sum, the Department wanted mother to "take care of her children's medical and mental health needs, stay clean and sober, protect herself and her children from violence and chaos, stay in contact with the Department, and test when asked without excuses." After reviewing the interim report on January 17, 2014, the juvenile court informed mother that she "really" needed to "[s]tep up."

Ultimately, however, on March 17, 2014, the Department filed supplemental petitions pursuant to section 387 seeking re-detention of the minors. In addition to the concerns described above, the Department reported that mother had failed to drug test on three occasions in early March. She also continued to neglect the minors' emotional and medical needs. The children, for instance, were provided with poor nutrition, despite C.T.'s obesity. Further, mother failed to follow up with a pediatric cardiologist as required for C.T. due to concerns regarding his medication. As a result, C.T.'s medication was decreased, his negative behaviors escalated, and he was sent home from school on independent study until he could better control himself. Mother also neglected burns C.T. received on a wood stove to the extent that he developed MRSA (Methicillin Resistant Staphylococcus Aureus) abscesses that required lancing, draining, and packing. In addition, S.T. was not attending school on a regular basis, with 18 absences and 9 tardies. T.T., who suffers from pulmonary problems, was exposed to second hand

7

marijuana and tobacco smoke. Also of concern was the fact that mother had cashed a $599 benefit check she had been provided to buy wood to heat the family home, but instead had purchased bicycles for her children, given $100 to a friend, and bought drugs. Mother later told a fraud investigator that her friend had stolen the check and forged her signature, an allegation which was disproved by video evidence. Mother additionally claimed to be working as a CNA, another story which proved to be untrue.

Moreover, on February 13, 2014, mother reportedly drove while under the influence of alcohol with C.T. in the car and ultimately left the minor with a paternal uncle who had recently been arrested on domestic violence charges. S.T. and T.T. (then five and two years old) were left home alone. That same night, mother made a threatening phone call to a cousin-in-law and later drove to her house and threatened her in person. The next day, family members brought mother home intoxicated and, when she woke up, she reportedly did not know where her children were. On February 15, 2014, mother made a false police report indicating that the paternal uncle had stolen her car and kidnapped C.T. while threatening her and the minor with a firearm. ~(CCT 358, 384, 403-404)~ That same day she was observed standing in the extreme cold with her children in a parking lot. Mother, having located her car, refused to leave without it, despite the fact that it was locked and she had no keys. While the domestic violence in the household had dissipated with father's absence, the Department opined that mother was creating a different kind of chaos for the minors that was equally, if not more, detrimental. It sought removal of the minors from their mother's care.

At the conclusion of the contested detention hearing on March 21, 2014, the juvenile court detained all three minors, and they were placed with their paternal great-aunt and uncle. Jurisdiction on the supplemental petitions was uncontested and was established on April 4, 2014. In its dispositional report on the supplemental petitions, the Department again identified problem areas for mother which required intervention. Specifically, the Department concluded mother needed help dealing with: (1) substance abuse; (2) lack of a support system; (3) dysfunctional personal relationships; and (4) coping with stress. It recommended that mother engage in the following services:

8

(1) a mental health assessment; (2) identification of at least two people she can turn to for assistance when she is feeling overwhelmed; (3) participation in a 24-week Seeking Safety program at Harrington House; (4) attendance at all medical and dental appointments for the minors; (5) cooperation with the Linkages program with respect to employment and benefits; (6) substance abuse treatment; and (7) random drug testing.

The Department also detailed escalating problems with C.T., noting that he had daily outbursts and had hurt every individual in his current relative placement. According to the paternal great-aunt, he had threatened to stab both S.T. and T.T. with a knife, choked both minors, pulled out chunks of others' hair, spit at people and objects, hit her twice in the face, and kicked her in the calf causing serious bruising and pain. ~(CCT 510, 515)~ In addition to individual therapy and medication, C.T. was receiving rehabilitative services, which included accompaniment to school, one-on-one behavior modification, and art therapy. More intensive in-home therapeutic services were planned. At the April 18, 2014, dispositional hearing on the supplemental petitions, the juvenile court adopted the Department's recommendations and ordered mother to comply with the terms of her reunification plan.

Shortly thereafter, however, the Department filed an update on C.T., recapping the many concerning behaviors engaged in by the six-year-old and indicating that he had recently been taken to the emergency room for his behavior, where he had attempted to unplug monitors and equipment and tear the television down. He had also begun smearing his feces on the wall, floor, toilet, and bathtub in the bathroom and would urinate on the floor or on the top of the toilet lid in hopes that someone would sit on it. On May 2, 2014, after a hearing during which it learned that C.T. had been hospitalized and psychiatrically evaluated the day before, the juvenile court authorized C.T. to temporarily reside with mother, with daily services in place. The Department felt that a one-on-one placement with intensive services was, at that point, the best option for the minor. On May 9, 2014, the Department reported that C.T. was doing well in his placement with mother, although mother was neglecting her own services to focus on the

minor. The court ordered the return of C.T. to his mother's care and continued the matter for development of a new case plan for mother.

By May 23, 2014, however, things had again deteriorated. C.T. was not doing well and was not attending school or speech therapy due to his violent behaviors. Mother had missed one of C.T.'s appointments with his rehabilitation specialist and had failed to refill his medications, contributing to his escalating behaviors. On May 12, 2014, mother refused to drug test, and the next day she tested positive for methamphetamine. Finally, mother admitted to driving C.T. in an unregistered vehicle without insurance, despite repeated warnings that she was not to drive with the minor.

On May 28, 2014, the Department chronicled its concerns in a supplemental petition, asking the juvenile court to again remove C.T. from his mother. In the opinion of the Department, C.T. needed a consistent, structured environment with skilled, experienced staff in order to gain control over his behaviors. Mother, for her part, did not believe that C.T.'s extreme behavior was related to the chaotic lifestyle she had created for him. Instead, she blamed the Department for all of his problems. The juvenile court detained C.T. over mother's objection on May 29, 2014. Jurisdiction was established with respect to certain portions of the supplemental petition on June 20, 2014. C.T. was ultimately placed out-of-county in a licensed group home.

At the July 11, 2014, dispositional hearing on this second supplemental petition, mother was reported to be three months pregnant by a man other than father. In addition, she had been arrested in June for receiving stolen property, criminal conspiracy, and petty theft. She was not engaged in services. Father, in contrast, had recently decided to change his life and was engaged and doing well in services. The court ordered mother to comply with her amended case plan, which included all of the elements of her previous plan, as well as the requirements that she be actively involved with helping to care for C.T.'s special needs and that she accept responsibility for her actions.

In its report for the October 2014 status review hearing in these matters, the Department finally recommended that reunification services be terminated for both parents and that the three children be referred for the development of permanent plans.

10

~(CCT 735)~ On September 29, 2014, father had been asked to leave his sober living environment due to a positive drug test, and he admitted to staying with mother at a friend's home. He appeared to be "caught up again in his addiction." Mother was assigned to a dual diagnosis substance abuse treatment group, but had failed to attend. She tested positive for methamphetamine five times in June and July 2014 and had not tested since that time. She was not compliant with the Linkages program. Further, she had not participated in the Seeking Safety group and continued to associate with people with drug and criminal histories. Mother also did not complete a mental health assessment, despite a referral by the Department. And, she was not consistent with visiting her children, nor was she involved in their medical appointments or therapy. According to the Department, she seemed to have lost interest in working to get her children back. Nevertheless, both parents reportedly believed that they could safely parent the minors, including C.T.[4] They stated that if they were given financial assistance so that they could have their own home, "everything would be fine." In contrast, the Department, after working "tirelessly" for two years "to believe in and support this family" so that they could reunite, had come to the conclusion that mother was a "manipulative, untrustworthy, and self-absorbed person" who—unable to get her children back—was now sabotaging father so that he would also fail.

At the contested review hearing on October 28, 2014, , mother testified that, after a recent suicide attempt, she had begun taking medication that helped her lower her anxiety, stay calm and focused, and be a better parent. She also indicated that she had housing and a job. On this basis, mother agreed to submit the matter, with her attorney indicating that she hoped to be in a position to file a petition for modification based on changed circumstances prior to the minors' permanency planning hearing. Thereafter, the juvenile court terminated reunification services and scheduled a permanency planning hearing with respect to all three minors for February 20, 2015. In reaching its decision to

---

[4] C.T. was reported to be doing well in his group home. Significantly, he was attending second grade in a mainstream class with few behavioral issues. Although he was behind in school, his group home counselor was working with him on his academic issues.

terminate services, the juvenile court expressly stated to mother: "I find that you simply have not participated in services for the reasons set forth in the social worker's report."

Mother subsequently filed a timely notice of her intent to file a writ petition, and the petition itself was filed on November 12, 2014. (Rules 8.450(e) & 8.452.)

## II. TERMINATION OF REUNIFICATION SERVICES

We construe mother's pro per petitions in these matters as advancing the sole argument that her reunification services should not have been terminated at the October 2014 review hearing because reasonable services had not been provided to her.[5] The adequacy of a reunification plan and the reasonableness of the reunification efforts made by a child welfare agency must be judged according to the circumstances of each case. (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.) In particular, to support a finding that reasonable services were offered or provided, "the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult (such as helping to provide transportation and offering more intensive rehabilitation services where others have

---

[5] Arguably, mother has forfeited this argument by submitting the matter at the October 28, 2014 hearing, thereby failing to raise any issue of reasonable services in the court below. (See *In re Christopher B.* (1996) 43 Cal.App.4th 551, 558 ["[i]n dependency litigation, nonjurisdictional issues must be the subject of objection or appropriate motions in the juvenile court; otherwise those arguments have been waived and may not be raised for the first time on appeal"]; *In re Kevin S.* (1996) 41 Cal.App.4th 882, 885 [mother waived the right to contest finding of reasonable reunification efforts by not objecting in trial court]; *Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 813 ["If it was the father's position that he did not receive certain services to which he was entitled, he should have cross-examined the social worker who prepared the report or introduced his own evidence on the issue rather than submit on the report. In addition, for him to now make this argument amounts to nothing more than an attempted sandbagging of the trial court. This we cannot tolerate."].) However, although her attorney submitted without argument, mother was permitted to speak during closing arguments and made statements which could be interpreted as challenging the adequacy of the services provided by the Department. Under such circumstances, we will reach the merits of mother's claim.

12

failed).” (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.)  We review a reasonable services finding for substantial evidence.  (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762.)  Having reviewed the underlying facts in these cases in some detail, we have no difficulty concluding that the services offered or provided to mother by the Department were reasonable.

Even before petitions were filed with respect to the three minors, the Department attempted to address the problems faced by this family through the provision of voluntary services.  After the minors were detained, the Department appropriately identified the problems which led to mother’s loss of custody as the parents’ domestic violence issues, mother’s substance abuse, and her inability to understand how her life choices were affecting her children.  The reunification plan adopted for mother contained numerous services designed to remedy these problems and the Department made the necessary referrals for all of these services.

In addition, over the course of these dependency proceedings, the Department tried placing the minors back with their parents when appropriate and even tried an emergency placement of C.T. with his mother at one point in an attempt to avoid an out-of-county group home placement for the troubled minor.  Each time a particular intervention failed, a new plan was formulated by the Department and new referrals were made, taking into account the family’s needs.  For instance, additional services—such as couples counseling, assessment for more intensive domestic violence services, and a referral for a mental health assessment—were offered to mother at various points during the reunification period as it became clear that sustained compliance with her plan was proving difficult.  Numerous services were also provided to address the minors’ many special needs.  Finally, the Department’s reports detail the myriad ancillary services provided to this family to support reunification, including everything from transportation assistance and crisis intervention to financial aid for telephone service, child safety items, security deposits, motel costs, and an alarm clock.  In short, the record in these cases amply supports the opinion of minors’ counsel, who stated at the October 2014 hearing: “I feel like if anybody wanted to see these parents be successful, it was this social worker.

13

Truly, sincerely devoted to their success." Unfortunately, although reasonable services were available to her, mother was unable to adequately address the problems which brought her family before the juvenile court, most notably her chronic issues with substance abuse. Thus, termination of mother's reunification services was proper.

Indeed, although no party raises the issue, we are concerned that the juvenile court in these cases may have provided excessive reunification services to the parents, thereby neglecting these emotionally and medically compromised minors' needs for stability and permanence. "As a general rule, when a child is removed from parental custody under the dependency statutes, the juvenile court is required to provide reunification services pursuant to section 361.5 to 'the child and the child's mother and statutorily presumed father.' " (*In re Jaden E.* (2014) 229 Cal.App.4th 1277, 1281, quoting § 361.5, subd. (a).) The presumptive rule for children under the age of three on the date of initial removal (such as T.T.) is that reunification services will be provided for a period of six months from the date of disposition. Members of a "sibling group" which includes a child under three (such as C.T. and S.T.) may, under appropriate circumstances, be similarly limited to six months of reunification efforts. (§ 361.5, subd. (a)(1)(B) & (C).)

Further, in only the most limited of situations may reunification services be extended for longer than 18 months from the time a minor is initially removed from the physical custody of his or her parents. Specifically, pursuant to section 366.22, subdivision (b), continuation of reunification services beyond this 18-month limit is permitted to the 24-month mark *only* if additional services are in the minor's best interests *and* the parent is making significant and consistent progress in a court-ordered residential substance abuse treatment program *or* was recently released from custody and is making significant and consistent progress in making a safe home for the minor's return. Further, even if these stringent requirements are met, services can still only be continued if there is a substantial probability of return within 24 months from initial removal or if reasonable services were not provided. (§ 366.22, subd. (b); see also *Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 596 [18-month limit on reunification services is " 'a recognition that a child's needs for a permanent and stable home cannot

14

be postponed for an extended period without significant detriment' "].)  Otherwise, reunification services may be continued beyond statutory limits only in extraordinary circumstances and only when such an extension is in the minor's best interests.  (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1790, 1798 [in extraordinary circumstances, such as with a special needs parent, reunification services may be continued pursuant to section 352].)

The "clock" for mandatory reunification services begins to run when a minor is removed from all parental custody at a dispositional hearing, and, once started, continues despite subsequent placement with a parent during the dependency.  (§ 361.5, subd. (a)(3) ["[p]hysical custody of the child by the parents or guardians during the applicable [reunification period] shall not serve to interrupt the running of the time period"]; see also *In re A.C.* (2008) 169 Cal.App.4th 636, 649 (*A.C.*) [reunification clock begins to run when minor is formally removed from both parents at dispositional hearing]; *Carolyn R. v. Superior Court* (1995) 41 Cal.App.4th 159, 164-167 (*Carolyn R.*) [once reunification clock begins, it continues to run despite placement of a minor back with a parent during the dependency].)  Thus, when a juvenile court sustains a supplemental petition pursuant to section 387, as it did on two occasions during this case, the proceedings do not return to square one with regard to reunification services.  (*In re Steven A.* (1993) 15 Cal.App.4th 754, 765 (*Steven A.*).)

Here, the three minors were initially removed from the physical custody of their parents on September 24, 2012.  They were formally detained from both parents in out-of-home care at the initial dispositional hearing on November 2, 2012.  Thus, their timeframes for the provision of reunification services pursuant to section 361.5 began running on that date.  Further, the reunification clock continued to run for all three minors when they were returned to their parents' care on March 15, 2013, and did not re-start when they were re-detained on March 21, 2014.  (See § 361.5, subd. (a); *A.C., supra*, 169 Cal.App.4th at p. 649; *Carolyn R., supra*, 41 Cal.App.4th at pp. 164-167; *Steven A., supra*, 15 Cal.App.4th at p. 765.)  Similarly, C.T.'s brief return to his mother for a second

time on May 2, 2014, and his re-detention on May 29, 2014, had no impact on that minor's reunification timeframes. (See *ibid.*)

Thus, by the time of the October 28, 2014, review hearing in these cases, the reunification clock was at 25 months for the three minors, significantly beyond any reunification period authorized by statute.[6] At that point, services could not have been extended further absent the most extraordinary of circumstances, and, indeed, it seems likely that no reasonable services finding was even necessary in order to refer the minors for permanency planning. (See § 366.25, subd. (a)(3); rules 5.708(m) & 5.722; Compare *Denny H. Superior Court* (2005) 131 Cal.App.4th 1501, 1511-1512 [prior to amendment of dependency law allowing for 24-month review, authority of juvenile court at 18-month hearing to set a permanency planning hearing pursuant to section 366.26 is not conditioned on a reasonable services finding].) Given these facts, it was manifestly not erroneous for the juvenile court to terminate reunification efforts and set a hearing pursuant to section 366.26. Rather, as the Department opined, it was past time for "this cycle of dysfunction, criminality, drug abuse, and system reliance . . . to be ended for these children."

## III. DISPOSITION

The petition is denied on the merits. (See § 366.26, subd. (l)(1)(C), (4)(B).) Because the permanency planning hearing in these matters is set for February 20, 2015, this opinion is final as to this court immediately. (Rules 8.452(i) & 8.490(b)(2)(A).)

---

[6] The parties below appear to have been under a misapprehension as to the applicable time limits for reunification services in this case, believing that only time spent out of parental custody counted with respect to the applicable time frames.

16

_____
REARDON, J.

We concur:


_____
RUVOLO, P.J.


_____
BOLANOS, J.