Filed 10/20/21  M.M. v. Superior Court CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| M.M., | |
| Petitioner, | G060484 |
| v. | (Super. Ct. No. 19DP1029, 19DP1030) |
| THE SUPERIOR COURT OF ORANGE COUNTY, | O P I N I O N |
| Respondent; | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY et al., | |
| Real Parties in Interest. | |

Original proceedings; petition for a writ of mandate/prohibition to challenge an order of the Superior Court of Orange County, Jeremy D. Dolnick, Judge. Denied.

Donna P. Chirco, under appointment by the Court of Appeal, for Petitioner.

No appearance for Respondent.

Leon J. Page, County Counsel, and Karen L. Christensen, Deputy County Counsel, for Real Party in Interest, Orange County Social Services Agency.

No appearance for Real Parties in Interest, the Minors.

\* \* \*

In this petition, the father, M.M., contends the evidence was insufficient to support the juvenile court's orders denying the return of minors his daughters to his care, terminating his reunification services, and setting the case for a Welfare and Institutions Code section 366.26 hearing. As discussed below, we deny the petition.

I

FACTUAL AND PROCEDURAL HISTORY

A. *Removal of the Minors*

On August 26, 2019, SSA sought a protective custody warrant for the minors, requesting removal of the children due to Mother's ongoing and unresolved mental health issues and domestic violence issues and Father's continuing relationship with Mother despite being assaulted. Mother had threatened Father in front of the children and stabbed a kitchen table with a knife, and on August 12, 2019, after a safety plan had been developed for the parents, she had slapped Father twice in the presence of two children and later punched him. The juvenile court granted the application, finding continuing in the home would be contrary to the children's welfare.

On August 28, 2019, SSA filed a petition alleging the minors came within Welfare & Institutions Code section 3000, subdivision (b)(1), due to the parents exposing them to domestic violence.[1] The parents later submitted on, and the juvenile court sustained, the amended petition. The parents stipulated they exposed the children to domestic violence, Mother had been arrested for battery on the father, and Father had a criminal history of disorderly conduct and inflicting corporal injury on a spouse.

At the detention hearing, the juvenile court found it was an immediate and urgent necessity that the minors be detained from the care of parents. It granted the

_____

[1] All further statutory references are to the Welfare & Institutions Code, unless stated otherwise.

parents eight hours a week, supervised visitation, and ordered SSA to provide reunification services. As part of Father's case plan, he completed a parenting class in November 2019. On December 4, 2019, Father's counsel informed social worker Saldivar that Mother would move out by the end of the week and asked for a home assessment. When Saldivar contacted Father on December 23, 2019, Mother had not moved out yet.

At the January 7, 2020 disposition hearing, the court found continued placement of the children was necessary and appropriate, and that the progress of the parents to alleviate or mitigate the causes necessitating placement had been minimal.

B. *Six-Month and 12-Month Reviews*

In her June 4, 2020, six-month review report, Senior Social Worker Andrea Guillen stated that Father and Mother continued to reside together in a one-bedroom apartment. Father mentioned "he is in a relationship with the mother, however, he is also thinking about possibly moving . . . because the mother is always angry with him." Due to the pandemic Father had video visits with the minors, but failed to call several times. He explained he did not have the phone number for the video visits, and Mother did not allow him to call. Guillen forwarded him the number. Guillen also encouraged Father to seek medical attention after he reported his vision was blurry.

Mother told Guillen she did not love Father or want to be in a relationship with him; she only resided with Father because he paid the rent. Mother contacted Guillen several times and "left voicemails expressing uncontrollable anger and making erratic comments that reflect that the mother has unresolved anger issues and that the mother may be suffering from a mental illness that has not been addressed." Guillen expressed concern that the parents "continue to reside in the same household despite the conflicts that are continually occurring."

On June 10, 2020, Father reported he planned to move out later that month, but would still help Mother with rent. In August 13, 2020, however, the parents were still

3

living together.  On August 23, the minors' caregiver wrote to Guillen expressing concerns about Father's vision problem that manifested during a visit.  When Guillen spoke with Father, he said he would call that week to schedule a vision appointment.

On September 1, 2020, Mother informed Guillen she had moved but still received mail at Father's address.  Mother said she did not love Father but wanted to coparent with him.  Father said he wanted to be in a relationship with Mother.  When Guillen raised concerns about his vision, Father agreed he had trouble seeing, but stated he would be seeing a doctor.

On September 15, 2020, Father reported that after he asked Mother to take her cats with her when she moved out, Mother threatened to call immigration to deport him.  The following week, Mother reported she had taken Father to the hospital because he was suffering severe abdominal pain.  She also stated that ever since she moved out, Father would tell her he wanted her to move back and that he loves her.

On October 15, 2020, the juvenile court held the combined six- and 12-month reviews.  It found reasonable services had been provided to the parents and that they had moderate progress, and ordered reunification services be continued to the 18-month review date, February 24, 2021.  It ordered SSA to assess Father's home and to continue to assess the parents for liberalized visitation.

C. *18-Month Review Report*

In her 18-month review report, Guillen recommended that reunification services be terminated and a section 366.26 hearing be set to select a permanent plan for the minors.  Mother was living with her new boyfriend, who had a 2005 domestic violence conviction.  Mother again left voicemails for Guillen, which showed she continued to struggle with her mental health and unresolved anger issues.  Father was living with his sister and her family.

Guillen spoke with Father's therapist Vanessa Valdivia, who described Father as intensely codependent on Mother.  He had little insight, but had made some

4

progress on his goals and would benefit from further therapy. On February 5, 2021, Guillen informed Father she had sent another referral for therapy. On February 9, Father told Guillen he felt he needed further therapy and did not want his children adopted.

On March 4, 2021, Father reported that he had not seen an eye specialist yet because he was too busy with work. Father also stated he had not contacted Mother, but then apologized when Guillen informed him she was aware Mother was transporting Father to visits. Guillen also informed Father she was not able to refer him to an SSA-contracted counselor, and provided him with available resources for counseling such as the local Family Resource Center (FRC).

On May 4, 2021, Father told Guillen he did not know how he would attend therapy or more classes due to the visitation schedule and lack of transportation. He declined a bus pass, but agreed to call Magnolia Park FRC and reenroll in therapy.

On May 5, 2021, Guillen received a call from the caregiver for the sibling, Elisabel, who was upset after Father told her Mother had left with a man named Juan, who does drugs. Elisabel expressed concern that Mother would relapse, and Guillen told the child she would attempt to locate Mother. Guillen called Father, who stated he would go to Mother's home to check. The next day, Mother called Guillen and reported she was with Father, who was taking her to court.

D. *18-Month Review Evidentiary Hearing*

At the contested hearing on the 18-month review, Guillen testified she recommended terminating Father's services and setting a 366.26 hearing because the problems leading to the minors' removal had not been resolved. Specifically, Father failed to show he could protect the children from exposure to domestic violence by Mother. Guillen believed Father lacked insight and needed further therapy. When she interviewed Father about addressing Mother's domestic violence, he could not give an explanation why he continued to be with Mother or why he could not leave her. Guillen

5

believed Father needed to be more independent, learn appropriate parenting during visits, and address his vision problems. Guillen noted Mother still transported Father to visits.

Father testified Mother currently did not live with him and had never visited his residence. His relationship with Mother ended on September 5, 2020. Father initially testified he last contacted Mother in January 2021, before acknowledging he asked Mother to drive him to three visits in February. Father explained he would have missed the visits if he had taken the bus after work, but stated he no longer needed to rely on Mother to transport him because beginning in March he received permission to leave work earlier.

Father testified he missed a recent visit because he had gone to see an eye specialist to address the caregivers' concerns about his vision. Father, however, denied telling Guillen he had vision problems or had lost sight of a child during a visit. He also denied speaking to Elisabel about Mother.

During questioning by his counsel, Father stated he did not believe his relationship with Mother was at any time an abusive relationship. He initially denied that Mother was aggressive against him, but later acknowledged she had hit him in the face. Father testified the children were removed because he failed to protect the children from Mother's aggression against them. He further testified he would protect the children by calling the police.

Mother testified she was the person who ended the relationship. Initially, Father could not accept the end of their relationship, telling Mother he still loved her. Mother acknowledged she transported Father to his visits three times. She denied attending video visits with Father in 2021.

Father's therapist Valdivia testified Father gained some insight into his codependent behavior and was taking "steps to be more independent and focus on the safety of his children." Valdivia did not recall telling Guillen Father was intensely codependent or gained little insight. She recommended further therapy for Father, but

6

had told Guillen everyone could benefit from additional therapy, not just Father. After Father completed therapy, Valdivia wrote a report where she concluded Father needed to work on his conflict resolution and that he "has a lot of unresolved issues with self-esteem and co-dependent behavior, and needs to continue working on his goals in order to maintain and further support areas of therapy."

After the evidentiary hearing, the juvenile court found by a preponderance of the evidence that returning the minors to the parents would create a substantial risk of detriment to the children's well-being. The court found the parents were offered reasonable reunification services. Father's progress had been moderate and Mother's was minimal. The court terminated the Father's reunification services, and set the matter for a hearing pursuant to section 366.26.

The court stated the primary issue it considered in determining whether to reunite Father with the minors was whether Father could protect them from Mother; it did not consider Father's vision problems an issue that would prevent return of the children. It concluded that "[a]lthough the father may get passing grades in many aspects of his case plan, he does not so when it comes to his ability to be protective of the minors from the mother." The court commended Father's progress, but stated it was not convinced Father would call the police if Mother appeared on his doorstep because he had not demonstrated appropriate boundaries. Father continued to have contact with Mother and involved a child in his problems with Mother. His therapist reported that Father had unresolved issues with self-esteem and codependent behavior and needed to continue working on those goals, but Father had arguably regressed following termination of his therapy.

The court found that SSA continued to make efforts to encourage and assist Father in additional therapy, but "Father did not do his part and admitted as much. [He] conveyed a need and desire to have therapy, but did not express any barriers to further enrollment nor expressed any need for assistance from the social worker." The court

7

found no good cause to extend reunification services to the 24-month date, which was six weeks away. It granted funding for additional therapy for Father pending the 366.26 hearing.

## II

## DISCUSSION

A. *Substantial Evidence Supports the Trial Court's Finding of Detriment*

Section 366.22, subdivision (a)(1), provides that at the 18-month review hearing, the juvenile court "shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment." In making its determination, the juvenile court shall consider "the efforts or progress, or both, demonstrated by the parent or legal guardian and the extent to which he or she availed himself or herself of services provided . . ." (§ 366.22, subd. (a)(1).) If "the child is not returned to a parent or legal guardian at the subsequent permanency review hearing, the court shall order that a hearing be held pursuant to Section 366.26." (§ 366.22, subd. (a)(3).)

The juvenile court's finding of detriment is reviewed under the substantial evidence standard. (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400.) In reviewing for substantial evidence, "[w]e do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or evaluate the weight of the evidence. Rather, we draw all reasonable inferences in support of the findings, view the record most favorably to the juvenile court's order, and affirm . . . even if other evidence supports a contrary conclusion." (*In re Christopher L.* (2006) 143 Cal.App.4th 1326, 1333.)

Father argues the evidence was insufficient to support the juvenile court's finding of detriment because he participated in parenting classes and counseling, was no

8

longer in a relationship or living with Mother, was bonded and appropriate with his children during visits, and had resources to support the minors' needs. We disagree. While some evidence could support a contrary finding, there was ample evidence in the record to support the juvenile court's finding of detriment. As the court noted, although Father had made some progress, he failed to demonstrate he would protect the minors from Mother. Mother remained a risk because she still had not resolved her mental health and anger issues. Father has not demonstrated he would turn Mother away or call the police if Mother appeared, uninvited, at his home. For example, in response to his counsel's questioning, Father stated his relationship with Mother was never abusive, before acknowledging she had physically assaulted him. Mother testified Father could not accept the end of their relationship, and repeatedly called her to say he still loved her. Although Father moved out, he kept in regular contact with Mother, including asking her for rides to visits and giving her a ride to court. In sum, substantial evidence supported the trial court's finding that return of the minors to Father posed a substantial risk of detriment to their safety, protection, or physical or emotional well-being.

B. *Father Was Provided Reasonable Services*

Father also argues the juvenile court erred in denying him additional reunification services because he was not provided reasonable services. Specifically, Father complains his visits were not liberalized to unmonitored visits due to misplaced concerns about his vision, and SSA failed to ensure he could participate in additional therapy despite his stated desire for additional therapy.

We review the juvenile court's finding that SSA had provided reasonable services for substantial evidence. (*Melinda K. v. Superior Court* (2004) 116 Cal.App.4th 1147, 1158.) The adequacy of "SSA's efforts are judged according to the circumstances of each case." (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.) "The standard is not whether the services provided were the best that might have been provided, but whether they were reasonable under the circumstances." (*Elijah R. v.*

9

*Superior Court* (1998) 66 Cal.App.4th 965, 969.) Furthermore, "'[r]eunification services are voluntary . . . and an unwilling or indifferent parent cannot be forced to comply with them.'" (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1365.)

Here, substantial evidence supported the trial court's finding that SSA provided reasonable services. Father does not provide any record citations showing he requested unmonitored visits in the months preceding the 18-month review. Even if he had, SSA would have acted reasonably in denying unmonitored visits because Father had not demonstrated he would protect the minors from Mother, who was present nearby at multiple visits. As to the additional therapy, the record shows Guillen encouraged Father to enroll in additional therapy and provided him referrals to local resources. She also offered a bus pass, which he declined.

Finally, Father has not shown good cause to extend reunification services beyond 18 months. The juvenile court generally lacks jurisdiction to extend reunification services past 18 months from the date of the children's removal from the parents' custody. (*Los Angeles County Dept. of Children etc. Services v. Superior Court* (1997) 60 Cal.App.4th 1088, 1091-1093.) The court has discretion to extend these services, for up to six months, upon a showing of good cause. (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1016 (*Mark N.*), superseded by statute on another ground as stated in *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1504.) In exercising that discretion, the court should consider: "the failure to offer or provide reasonable reunification services; the likelihood of success of further reunification services; whether [the children's] need for a prompt resolution of [their] dependency status outweighs any benefit from further reunification services; and any other relevant factors the parties may bring to the court's attention." (*Mark N. supra*, at p. 1017.) Here, Father was provided reasonable services. Moreover, with the 24-month date only weeks away, providing more reunification services would not have been meaningful. Lastly, we note the trial court did authorize funding for additional therapy until the section 366.26 hearing.

10

III

DISPOSITION

The petition is denied.


ZELON, J.*

WE CONCUR:


FYBEL, ACTING P. J.


GOETHALS, J.

*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11