Filed 2/10/23  Miguel V. v. Superior Court CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| MIGUEL V.,<br><br>　　　　Petitioner,<br><br>　　　　v.<br><br>THE SUPERIOR COURT OF FRESNO COUNTY,<br><br>　　　　Respondent;<br><br>FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>　　　　Real Party in Interest. | F085318<br><br>(Super. Ct. Nos. 21CEJ300095-2, 21CEJ300095-3, 21CEJ300095-4)<br><br><br>**OPINION** |

### THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Kimberly J. Nystrom-Geist, Judge.

Rodney Richard Rusca for Petitioner.

No appearance for Respondent.

Daniel C. Cederborg, County Counsel, and Ashley N. McGuire, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

[*]　　　Before Peña, Acting P. J., Snauffer, J. and DeSantos, J.

Miguel V. (father) petitions this court for extraordinary writ relief (Cal. Rules of Court, rules 8.450–8.452)[1] from a dependency court order terminating reunification services and setting a hearing under Welfare and Institutions Code section 366.26[2] on March 9, 2023, to select a permanent plan for his now 15-year-old daughter, S.P., 12-year-old son, M.V., and four-year-old daughter, A.V. (collectively the children). Father contends the juvenile court erred in finding the Fresno County Department of Social Services (department) provided him reasonable reunification services and in finding it would be detrimental to return the children to his custody. Therefore, the court was required to continue reunification services for him or place the children in his custody with family maintenance services. Father further contends the department failed to comply with its duty of initial inquiry into his Indian[3] ancestry under the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) and related California law and thus the juvenile court erroneously found that ICWA did not apply. We find no merit to father's contentions and deny the petition.

### FACTUAL AND PROCEDURAL SUMMARY

#### A. Initial Removal

In March 2021, the department removed the children and their then 15-year-old half sister, N.P., from their mother Lisa P. (mother)[4] after mother was arrested for threatening a neighbor with a firearm. The police were familiar with mother, having received other reports of her brandishing a firearm. Mother believed the neighbor was

---

[1] Rule references are to the California Rules of Court.

[2] Statutory references are to the Welfare and Institutions Code.

[3] "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1 (*Benjamin M.*).)

[4] Mother did not seek writ review.

2.

telling others that she watched child pornography and confronted the neighbor at the neighbor's apartment. Mother pointed the gun at the neighbor and racked the bolt of the firearm.

During a search of mother's apartment, the police found an unloaded handgun in the bottom drawer of the children's bedroom closet, an empty 10-round magazine for the handgun on top of the refrigerator, and a pipe used for smoking methamphetamine in a bathroom drawer. The refrigerator smelled rancid and contained rotten food. Mother was arrested and charged with assault with a firearm, criminal threats and misdemeanor child abuse. The children and N.P. were placed in foster care.

## B.    Paternity

Father and mother (collectively the parents) were married from October 2015 to September 2018. Only A.V. was born during the marriage and father was only listed on M.V.'s birth certificate. Nevertheless, he held all the children, including N.P., out as his own and lived with them until six months before they were removed.

Ruben H. was identified as N.P.'s father on a declaration of paternity mother previously filed for family support. He was not listed on N.P.'s birth certificate and did not believe he could be N.P.'s father since he was in and out of prison. N.P. did not know Ruben and had never met him. Ruben's whereabouts were unknown throughout the proceedings, although a social worker located him in April 2021 and instructed him to contact the emergency response social worker. At that time, Ruben stated he was homeless in Oregon.

## C.    Detention

The department filed an original dependency petition on behalf of the children and N.P., alleging they were described under section 300, subdivision (b). The allegation, consisting of one count, was that mother had a substance abuse problem that placed her children at risk of serious harm or neglect and failed to protect them by leaving drugs and a firearm accessible to them. The petition listed Ruben as N.P.'s alleged father and father

as the presumed father of S.P., M.V. and A.V. In the detention report dated March 15, 2021, the department stated ICWA may apply. However, the department had not asked mother about the family's Indian heritage because she was incarcerated.

The juvenile court ordered the children and N.P. detained pursuant to the petition at the detention hearing on March 15, 2021, which the parents attended. According to the minute order of the hearing, the parents "stated orally in court" that they did not have any Indian ancestry. The court offered the parents parenting classes, substance abuse, mental health and domestic violence evaluations and recommended treatment and random drug testing. The court also ordered supervised visitation for father with N.P. and the children and supervised visitation for mother upon her release from custody and calendared a combined jurisdiction and disposition hearing for April 14, 2021.

## D. Jurisdiction and Disposition

By the jurisdiction and disposition hearing in April 2021, N.P. and the children were placed with their maternal grandmother, Maria P. N.P. reported having visual and auditory hallucinations from a very young age but had never been prescribed psychotropic medication. She completed a mental health assessment and was referred for a psychiatric evaluation to assess her for psychotropic medication, individual therapy and a psychological evaluation. She did not want to visit father because she witnessed domestic violence between him and her mother and he beat her when she was younger. She preferred being with her grandmother. During a telephone conversation in April 2021 with the social worker, N.P., S.P. and M.V. said they were not very interested in visiting father.

The department reported that father had an extensive criminal history, including multiple convictions for driving under the influence (DUI). In 2014, he was court-ordered to complete an 18-month alcohol treatment program. Father denied being convicted of a DUI or being court-ordered to complete substance abuse treatment. The department determined the parents met the criteria for a denial of reunification services

4.

(§ 361.5, subd. (b)(13)) but recommended the juvenile court provide father reunification services.

The department also advised the juvenile court that father was not able to read and write. As a result, he had difficulty understanding written material and using technology. He identified his brother as someone who could help him. The department stated it would inform father's service providers of his limitations. Regarding ICWA, the department reported father's statement that he and mother did not have any Indian ancestry. However, the department had yet to ask mother. It reported, "The [ICWA] does not apply to the children, [S.P., M.V. and A.V.]. [¶] The ICWA may or may not apply as to the child, [N.P.]." On April 12, 2021, the department attempted to reach Ruben. However, he had not made himself available to inquire about his Indian ancestry.

On April 14, 2021, the juvenile court set a contested jurisdiction and disposition hearing for July 21, 2021, at which the court appointed a guardian ad litem (GAL) for mother. The hearing was then continued to August 11, November 3, and December 21.

Meanwhile, mother was found not competent to stand trial in her criminal case and was committed to a state hospital. Father was having unsupervised visits with N.P. and the children and visits were reportedly going well. He maintained excellent communication with the department and was active in all services offered to him.

On December 21, 2021, the juvenile court adjudged N.P. and the children dependents as alleged in the petition, ordered the parents to complete the services previously offered and ordered mother to undergo a psychological evaluation and risk assessment. The court ordered the department to investigate whether father could utilize his domestic violence assessment because of his reading and writing barrier and set a combined 6- and 12-month review hearing for May 5, 2022.

E.     **Reunification Period**

By the May 5, 2022, hearing, father was employed and had a two-bedroom apartment. He completed a parenting program and had perfect attendance. However, he

5.

said he really did not learn anything and did not agree with what was being taught. He completed a mental health assessment. However, because he was not forthcoming and truthful about his symptoms, the mental health provider was unable to make a treatment recommendation. Father also completed a domestic violence assessment and was referred for a child abuse intervention program and a batterer's intervention program. He enrolled in both programs in February 2022 and was an active participant in the batterer's intervention program. However, he was " 'defensive' " in the child abuse intervention program. He completed a substance use disorder screening and did not meet the criteria for treatment. He participated in random drug testing and tested positive several times for cannabinoids, opioids or creatinine from April to July 2021. From August to December 2021, he was unable to provide a sample twice and twice failed to test. However, he subsequently tested negative.

Regarding visitation, the children stated they enjoyed spending time with father but did not want to reunify with him. In April 2022, M.V. refused to participate in visits with father because father became upset with him during a prior visit and raised his voice. Father's raised voice caused M.V. to have " 'flash backs' " and made him scared. S.P. said she felt a lot of " 'hate' " toward father for what he did to her mother. She thought it best she remain with her grandmother where she felt safer. She was concerned that if she reunified with father, " 'the niceness will wear off and he'll go back to his old self.' " N.P. said reunifying with father was " 'not an option.' " She was not sure whether she wanted to reunify with her mother. A.V. said she enjoyed seeing father but did not want to live with him, preferring to stay with her grandmother.

During a child and family team (CFT) meeting in April 2022, father stated he was participating in services because he " 'has to.' " He said he " 'really has not learned anything from the classes' " and did not agree with what he was being taught. When it was pointed out the children disclosed domestic violence and volatile relationships in the home, father said those incidents were in the past and the children needed to move on.

The decision was made not to advance father to liberal visits because N.P., S.P. and M.V. reported having flashbacks about the domestic violence they observed.

In its report for the 6- and 12-month review hearing, the department recommended the juvenile court terminate reunification services. The department opined the likelihood of father reunifying was poor since he was not applying what he learned in his services to improve his relationship with the children. Mother was still in a state hospital where she was expected to remain until September 2022. Because she had been incarcerated and institutionalized during the reunification period, she was unable to make any progress toward reunifying with the children.

The May 5, 2022, hearing was continued and conducted as a contested 6-, 12- and 18-month review hearing in October and November 2022.

Meanwhile, mother was transported to the Fresno County jail where she remained. In September 2022, an investigator met with N.P., M.V., and S.P. separately and asked them a set of questions approved by the parties to assess how they felt about returning to their parents' custody. N.P. was not sure if she would feel safe in mother's care but might if father were not there. She looked forward to visits with father and enjoyed them. However, she did not want to live with him, preferring instead to remain with her grandmother under a legal guardianship. M.V. felt safe returning to mother's but not father's care. He did not want to live with father because father angered easily. He did not believe there was anything that could be done to make him feel safe. S.P. felt safe with mother and wanted to return to her custody. She looked forward to visits with father and enjoyed them. She would not feel safe living with father but might in the future if he got his anger under control.

In October 2022, the juvenile court appointed a GAL for father based on father's attorney's representation during an in-camera hearing that father was diagnosed with special needs and a learning disability in school and may not fully understand the nature and consequences of the proceedings. Father agreed to have a GAL appointed for him.

The parties stipulated to the use of the investigator's report in lieu of the children's testimony.

In a report filed before the hearing, the department reiterated its recommendation the juvenile court terminate reunification efforts and set a section 366.26 hearing.

**F.     The 6-, 12- and 18-Month Review Hearing:  October and November 2022**

**1.  October 18, 2022 Testimony**

On October 18, 2022, the first day of the hearing, father's attorney presented two documents dated September 2022 from ASI Counseling and Professional Services, one for the 52-session child abuse intervention program and the other for the 52-session batterer's intervention program.

*Olivia Guzman's Testimony*

Olivia Guzman, co-director of ASI Counseling and Professional Services (ASI), testified about an incident in May 2022 when father reportedly missed a class. Guzman confirmed that he had missed the class.

*Daisy Raygoza's Testimony*

Social worker Daisy Raygoza testified she received a call in June 2022 from Guzman, reporting father was agitated and yelled at the facilitator about his missed class. Raygoza was not aware of any subsequent incidents with father and ASI. She was aware that father was illiterate and believed that the service providers were aware that he struggled to read and that they made modifications so that he could complete his classes. One accommodation they made was to allow father to participate in person even though the classes were offered as virtual classes. Father never complained to her that he needed any additional accommodations and Raygoza spoke to someone at ASI in February 2022 to ensure he was understanding the classes and was told that he was.

The department recommended termination of father's reunification services because his behavior had not changed. During the CFT in April 2022, he said he was attending classes because they were required and he was defiant when he did not get his

8.

way. He also raised his voice toward the maternal grandmother, which made it difficult when the children were picked up and dropped off. However, father was reportedly behaving better in August 2022.

Father began liberal visitation sometime around September 23, 2022. He picked the children and N.P. up on Friday and took them to school on Monday. N.P. consistently visited father and S.P. missed one visit. M.V. asked to leave the second day of the first liberal visit and had not visited father since. A.V. visited when her sisters did.

*Father's Testimony*

Father testified regarding the missed May class, explaining that he arrived three minutes late and the instructor allowed him to attend. A week later he was told that he would not get credit for attending but was then told they would "fix" it. When he got the report at the end of the month and noticed there were a few errors he brought it to a staffer's attention. When she refused to correct it, he raised his voice but he did not think he was yelling. After that, he was transferred to a different class. He started therapy a month before and his therapist helped him understand what he was learning in class. He believed the liberal visits with the children were going well. During their last visit, they went to the fair and N.P. passed out. Father attempted to hydrate her and remembered she complained the visit before that she did not feel well and that her heart hurt. He asked how her heart was feeling. She said it still hurt but not as intensely and she did not want to leave the fair. Father told the children, " 'This is a family decision. [N.P.] is saying she feels good, but I think we should take her to the doctor.' " A.V. said, " 'Yeah, let's take her to the hospital.' " They did and stayed until the next day. Father picked up her medication, made sure she was hydrated and ate and she seemed to be fine.

Father explained he attended his classes so he could be a better parent. When he said he attended because he "ha[d] to," he was speaking to the social worker supervisor whom he did not know. He "froze up." He did not agree that he was defiant and believed he was benefitting from his classes.

9.

Following father's testimony, the juvenile court heard argument but paused it and continued the hearing until November 1, 2022. On November 1, 2022, the court continued the matter to November 15, 2022, for its ruling.

## 2. November 15, 2022, ICWA Inquiry and Ruling by the Juvenile Court

*ICWA Inquiry*

The juvenile court expressed its dissatisfaction with the department's efforts to inquire about the family's Indian heritage and made its own inquiry. The juvenile court asked mother if she had Indian heritage in her family. She said she did not. Asked whether there was anybody that knew more about her heritage than her, she said her mother would. The court asked Maria, who was present, whether there was any Indian heritage in her family. She said no. The court asked her whether there was a generation either above her, like her parents, or siblings that might know more about her heritage. She said there was not.

Father also told the juvenile court he did not have any Indian heritage in his family. He did not know of anyone who knew more about his heritage. He provided his mother's name and said she was living in Mexico. He did not have a relationship with her, did not speak to her and did not have a telephone number for her. The court noted she had not appeared in the proceedings. Father had siblings with whom he had a relationship. His siblings spoke to his mother and were likely to have information about his Indian heritage. He provided the names of two of his sisters and his brother and phone numbers for his brother and one of his sisters.

The juvenile court found the department exercised due diligence in attempting to locate Ruben and that his whereabouts were unknown. The court found therefore it had not been possible for the department to inquire about his Indian ancestry. The court asked mother if she knew anyone in Ruben's family. She knew an aunt and provided her first and last name. She had not spoken to her for 16 or 17 years but believed she lived somewhere in Utah. She said Ruben's father was part Indian. Ruben was not enrolled in

10.

a tribe and did not live on a reservation. He never told mother that anyone in his family was born on a reservation or had a tribal name. Mother never met Ruben's father and Ruben did not give her any information about his father that would assist the court and the department in finding out about N.P.'s heritage. Maria did not have any information about Ruben's aunt.

The juvenile court stated, "There has been inquiry of the mother and [maternal grandmother] by the [c]ourt today. It does not appear that the [d]epartment made any effort to discover the information about Ruben .… His whereabouts are unknown, but the mother does know the name of a relative and does believe that his father was … part Indian, and I have no information to indicate the [d]epartment had made any inquiry of the mother about [Ruben's] background. And as to [father], he was easily able to provide information now regarding his extended family. Even though his mother lives out of the country, there are other people who would have his mother's information."

The juvenile court directed the department to attempt to contact Ruben's aunt in Utah and to inquire of father's extended family, to complete notices and provide full and complete information in the next report. The court stated, "I would prefer to never receive a report that just says that [ICWA] does not apply. I have no facts behind that conclusion and no ability to reach that same conclusion myself."

The juvenile court stated, "[I]t does appear that [ICWA] does not apply, although it may apply to [N.P.] based on the information the mother provided today.… [T]he [c]ourt has instructed the [d]epartment accordingly."

*Ruling*

The juvenile court found the department "far exceeded" its burden of proving that returning the children to parental custody would create a substantial risk of detriment to their physical and emotional safety and well-being. The court stated,

> "The children have flashbacks. [M.V.] can barely be around the father at all. Their physical health is in danger, as demonstrated by [N.P.'s]

11.

medical event that it was only with the input of a four-year-old [(A.V.)] that appropriate medical interventions were made for her. That none of the children report wanting to reunify with the father. All of them are reporting flashbacks. The father does not take responsibility for that and that the children have to move on instead of understanding how difficult these circumstances are for the children. They do not feel safe living with him. They do not feel that they could be made safe to live with him.

"So the [c]ourt would find the [d]epartment has more than met the burden by a preponderance. I would make this finding by clear and convincing evidence."

The juvenile court found by clear and convincing evidence the department provided the parents reasonable reunification services and there was not a substantial probability the children could be returned to either parent by the 24-month review hearing. Consequently, the court terminated reunification services and set the section 366.26 hearing.

## DISCUSSION

### A. Adequacy of Writ Petition and Issue Preservation

As a preliminary matter, it bears noting that the writ petition before us is susceptible to dismissal on two grounds. First, the petition fails to comport with rule 8.452, which requires that the petition be accompanied by a memorandum which states "each point under a separate heading or subheading summarizing the point and support each point by argument and citation of authority." (Rule 8.452 (a)(3) & (b)(2).) The memorandum must also "support any reference to a matter in the record by a citation to the record. The memorandum should explain the significance of any cited portion of the record and note any disputed aspects of the record." (Rule 8.452(b)(3).) Failure to comply with rule 8.452 renders the petition inadequate in its content and the reviewing court need not independently review the record for possible error. (*In re Sade C.* (1996) 13 Cal.4th 952, 994.)

Here, in the section of the writ petition (JV-825) designated for identifying the juvenile court's error, appellate counsel asserts that it was improper for the court to

12.

terminate father's reunification services. He contends the court should have either continued reunification services or provided father family maintenance services. In a document attached under a section entitled "Points and Authorities," appellate counsel presents a paragraph which contains conclusory statements suggesting father's reunification services were not tailored to his special needs and the department's ICWA inquiry was inadequate and the matter should be remanded. On another page under a section entitled "Argument," counsel asserts that the department was unreasonable in recommending termination of reunification services in light of father's substantial compliance and the court erred in attributing blame to father for N.P.'s fainting spell at the fair. Nowhere does counsel tie any of these statements into a legal argument supported by citations to the record, citation of legal authority and application of the law to the facts. As a result, the petition does not comply with the memorandum requirements set forth by rule 8.452 and the petition is technically inadequate for review. For the same reason, the petition is subject to dismissal as abandoned. (*Berger v. Godden* (1985) 163 Cal.App.3d 1113, 1119–1120 [contentions not supported by argument are deemed abandoned].)[5]

Despite the inadequacy of the writ petition and counsel's effective abandonment of any issues he attempts to raise, we decline to dismiss the writ petition in this case in the interest of justice and to avoid any possible claim of ineffective assistance of counsel and will construe it as challenging the juvenile court's detrimental return, reasonable services and ICWA findings and its order terminating reunification services.

## B. Paternity

Another aspect of the writ petition that requires clarification upfront has to do with which children are the subjects of the petition. Appellate counsel identified all

---

[5] We conclude the writ petition is inadequate even considering appellate counsel's amendment to the petition, which we filed and considered.

four children, including N.P., as father's children. However, N.P. is not father's child. Although the department considered him her presumed father because of their longstanding relationship and he was granted visitation with her, the court never found him to be her presumed father, instead acknowledging Ruben as her alleged father throughout the proceedings. Further, father has not asserted, nor are we aware of, any authority that would grant him standing to challenge any of the court's orders as to N.P. Consequently, we regard S.P., M.V., and A.V. as the subjects of this writ petition and review the case accordingly.

## C.    Overview of Reunification Services

"The purpose of the dependency statutes is to provide for the protection and safety of a minor who comes under the jurisdiction of the juvenile court and, when consistent with the minor's welfare, to preserve the minor's family ties. [Citation.] 'Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect.' [Citation.] [¶] California's dependency statutes fulfill this duty by authorizing juvenile court intervention to protect children who are at a substantial risk of suffering physical or emotional harm. While the statutory scheme is designed to assist families to 'correct the problems which caused the child to be made a dependent child of the court' [citation], its focus remains on the well-being of the child." (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 900.)

"To achieve the goal of preserving the family whenever possible, the Legislature required the county child welfare departments to develop and implement family reunification plans and required the courts to monitor those plans through periodic review … at intervals of no less than six months and determine, among other things, whether reasonable reunification services have been offered." (*In re Daniel G.* (1994) 25 Cal.App.4th 1205, 1211.)

14.

The Legislature, however, also placed limitations on the duration of reunification services. In general, services are limited to 18 months from the date the child was originally removed from parental custody. (§ 361.5, subd. (a)(3).) The children were initially removed in March 2021, making September 2022 the 18th month.

At each review hearing, "there is a statutory presumption that the child will be returned to parental custody." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 308.) A court, therefore, must return the child to parental custody at the 18-month review hearing unless it finds by a preponderance of the evidence that doing so would "create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a).) It is the department's burden to prove the child would face some actual, nonspeculative risk if returned to parental custody. (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400.)

## 1. The 18-Month Review Hearing

By the time a dependency case reaches the 18-month status review hearing, the juvenile court has few options.[6] If the court finds it is safe to do so, it can place the child in parental custody and order family maintenance services. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 316.) However, if the juvenile court finds it would be detrimental to return the child, it must set a hearing under section 366.26 to select a permanent plan. (§ 366.22, subd. (a)(3).)

"In evaluating detriment, the juvenile court must consider the extent to which the parent participated in reunification services. [Citations.] The court must also consider the efforts or progress the parent has made toward eliminating the conditions that led to the child's out-of-home placement." (*In re Yvonne W.*, *supra*, 165 Cal.App.4th at p. 1400.)

---

[6] The fact that the hearing in this case was a combined 6-, 12- and 18-month review hearing does not alter the statutory limitations imposed by section 366.22, the statute governing the 18-month review hearing.

A parent's failure to participate regularly and make substantive progress in court-ordered treatment programs constitutes prima facie evidence that return would be detrimental. (§ 366.22, subd. (a)(1).) Technical compliance with court-ordered services, though significant, is not conclusive evidence a parent does not pose a risk of detriment to his or her child. It simply means there was not prima facie evidence of detriment. The court must still consider whether the parent eliminated the conditions leading to the child's removal and whether the child would be safe in parental custody. (See, e.g., *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1141–1142.)

Section 366.22, subdivision (b), however, allows the juvenile court, under circumstances not present here, to continue reunification services beyond 18 months. To qualify, the parent must be a resident of a court-ordered substance abuse treatment program; or recently discharged from incarceration, institutionalization, or the custody of the United States Department of Homeland Security; or a minor or nonminor dependent parent at the time of the initial hearing. The court must also find the parent is making significant and consistent progress, there is a substantial probability the child will be returned to parental custody, and it is in the child's best interest to continue reunification efforts. Under those circumstances, the court may continue services up to 24 months from the date the child was initially removed from parental custody. (§ 366.22, subd. (b).)

Another possible exception that would allow the juvenile court to continue reunification services beyond the 18-month review hearing is when the court finds the parent was never provided reasonable reunification services. (*In re M.F.* (2019) 32 Cal.App.5th 1, 21.)

"The adequacy of reunification plans and the reasonableness of the [department's] efforts are judged according to the circumstances of each case." (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.) To support a finding reasonable services were offered or provided, "the record should show that the supervising agency identified the

16.

problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult .…" (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.)

Given the important interests at stake, a parent bears some responsibility in bringing to the juvenile court's attention any obstacles that may hinder a parent's ability to participate meaningfully in reunification services. A parent may not "wait silently by until the final reunification review hearing to seek an extended reunification period based on a perceived inadequacy in the reunification services occurring long before that hearing." (*Los Angeles County Dept. of Children etc. Services v. Superior Court* (1997) 60 Cal.App.4th 1088, 1093.)

### 2. Standard of Review

We review the juvenile court's findings and orders for substantial evidence. (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1378–1379.) In so doing, "we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders. [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' " (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.)

#### a. Detrimental Return

Father contends he substantially complied, if not fully complied, with his reunification services, which required the juvenile court to either continue reunification services for him or place the children in his custody with family maintenance services. He further contends the evidence on which the court based its detriment finding—his handling of N.P.'s fainting spell at the fair—was insufficient. We conclude substantial evidence supported the court's detriment finding.

A key component of father's reunification plan was domestic violence counseling. The children had flashbacks of witnessing him harm their mother and suffered emotional harm as a result. M.V. at one point refused to visit father and S.P. had hatred for him. Therefore, it was important for father to demonstrate to the children that he could control his anger. Yet, he did not. He was combative with the social workers and the maternal grandmother and raised his voice to the children. As a result, the children did not want to be placed in his custody. Although the court mentioned the incident at the fair as a concern for the children's physical health, there was substantial other evidence that supported its finding. The juvenile court's decision whether to return a child to a parent's custody must be guided not by how compliant a parent has been in completing court-ordered services but "by the well-being of the child at the time of the review hearing; if returning the child will create a substantial risk of detriment to his or her physical or emotional well-being [citations], placement must continue .…" (*In re Joseph B.*, *supra*, 42 Cal.App.4th at p. 900.) Here, the juvenile court found the evidence of detriment in returning the children was compelling, surpassing even the required preponderance of the evidence burden of proof. We concur. Further, because the children could not be safely returned to father's custody, family maintenance services were not an option.

### b. Reasonableness of Reunification Services

Father contends the services provided by the department were not reasonable and tailored to his developmental needs. Since he does not specify which services were not reasonable and what his developmental needs are, we can only assume based on the facts of the case that he refers to his inability to read and write. The record reflects, however, that the department was aware from the beginning of father's inability to read and write and notified his service providers. According to social worker Raygoza, the service providers made accommodations and father never notified her that he needed additional assistance. Perhaps more importantly, father testified that he benefitted from his services,

in part with the assistance of his therapist. If father needed additional assistance in understanding what he was being taught, he and his attorney had ample time and opportunity during the 18-month reunification period to request it. Having failed to do so, he cannot now argue the department's efforts to provide him reasonable reunification services were inadequate. Thus, substantial evidence supports the juvenile court's finding father was provided reasonable reunification services and its orders terminating reunification services and setting a section 366.26 hearing.

**D.   ICWA**

### 1.   Overview

Congress enacted ICWA " 'to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture ....' " (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7–8.) Both ICWA and state law define an " 'Indian child' " as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); § 224.1, subd. (a) [adopting federal definition].)

"Because it typically is not self-evident whether a child is an Indian child, both federal and state law mandate certain inquiries to be made in each case. These requirements are sometimes collectively referred to as the duty of initial inquiry." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 741.)

Federal regulations implementing ICWA require courts to ask participants in a dependency case whether they know or have reason to know the child is an Indian child and to instruct the parties to inform the court " 'if they subsequently receive information that provides reason to know the child is an Indian child.' " (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 741.)

California law, however, "more broadly imposes on [the department] and [the] juvenile court[] (but not parents) an 'affirmative and continuing duty to inquire' whether a child in the dependency proceeding 'is or may be an Indian child.' " (*Benjamin M.*, *supra*, 70 Cal.App.5th at pp. 741–742, quoting § 224.2, subd. (a).) That duty to inquire "begins with [the] initial contact … and obligates the juvenile court and [the department] to ask all relevant involved individuals whether the child may be an Indian child." (*In re T.G.* (2020) 58 Cal.App.5th 275, 290, citing § 224.2, subds. (a)–(c).)

Under the statute, when the department takes a child into its temporary custody, its duty of initial inquiry "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child …." (§ 224.2, subd. (b).) Extended family members include adults who are the child's stepparents, grandparents, siblings, brothers- or sisters-in-law, aunts, uncles, nieces, nephews, and first or second cousins. (25 U.S.C. § 1903(2); § 224.1, subd. (c).)

The juvenile court, in turn, at a party's first appearance, must ask "each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child" (§ 224.2, subd. (c)) and require each party to complete an ICWA-020 form (Rule 5.481(a)(2)(C)). "The parties are instructed to inform the court 'if they subsequently receive information that provides reason to know the child is an Indian child.' (25 C.F.R. § 23.107(a) (2020); § 224.2, subd. (c).)" (*In re D.F.* (2020) 55 Cal.App.5th 558, 566.)

If that initial inquiry gives the juvenile court or department a "reason to believe that an Indian child is involved," then their duty to "make further inquiry regarding the possible Indian status of the child" is triggered. (§ 224.2, subd. (e).) And, once there is a "reason to know" an Indian child is involved, formal notice under ICWA must be given to the child's "parents or legal guardian, Indian custodian, if any, and the child's tribe." (§ 224.3, subd. (a); rule 5.481(c)(1); 25 U.S.C. § 1912(a).)

20.

Additionally, the department is required by the rules to document its inquiries. Rule 5.481(a)(5) provides, "The petitioner must on an ongoing basis include in its filings a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status, as well as evidence of how and when this information was provided to the relevant tribes. Whenever new information is received, that information must be expeditiously provided to the tribes."

The juvenile court may find ICWA does not apply to a child's proceeding if it finds the department's duty of inquiry has been satisfied and there is no reason to know that child is an Indian child. (§ 224.2, subd. (i)(2); rule 5.481(b)(3)(A).) The juvenile court's finding that ICWA does not apply thus " ' "implies that … social workers and the court did not know or have a reason to know the children were Indian children and that social workers had fulfilled their duty of inquiry." [Citations.]' " (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.)

## 2. Standard of Review

As recently set forth in our decision in *K.H.*, "[t]he juvenile court's finding that ICWA does not apply to the proceeding rests on two elemental determinations, 'subject to reversal based on sufficiency of the evidence.' (§ 224.2, subd. (i)(2).) The court must find there is 'no reason to know whether the child is an Indian child,' which is dependent upon whether any of the six circumstances set forth in subdivision (d) of section 224.2 apply. [Citation.] This inquiry is essentially factual and, therefore, is reviewed for substantial evidence. [Citations.] Under this standard, 'a reviewing court should "not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." [Citation.] The determinations should "be upheld if … supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence." ' [Citations.] The standard recognizes that '[t]rial courts "generally are in a better position to evaluate and weigh the evidence" than appellate courts' [citation], and 'an appellate

21.

court should accept a trial court's factual findings if they are reasonable and supported by substantial evidence in the record' [citation]. '[I]f a court holds an evidentiary hearing, it may make credibility determinations, to which an appellate court would generally defer.' " (*In re K.H.* (2022) 84 Cal.App.5th 566, 601 (*K.H.*).)

"The juvenile court must also find a 'proper and adequate further inquiry and due diligence ....' (§ 224.2, subd. (i)(2).) While we review the court's factual findings on the second element for substantial evidence as well, we agree with [*In re*] *Ezequiel G.* [(2022) 81 Cal.App.5th 984] that, consistent with the reasoning in [*In re*] *Caden C.* [(2021) 11 Cal.5th 614], a hybrid standard of review is appropriate. (*Ezequiel G.*, *supra*, 81 Cal.App.5th at pp. 1004–1005.) The inquiry is ultimately discretionary because it requires the juvenile court to 'engage in a delicate balancing of' various factors in assessing whether the agency's inquiry was proper and adequate within the context of ICWA and California law, and whether the agency acted with due diligence." (*K.H.*, *supra*, 84 Cal.App.5th at p. 601.)

### 3. The ICWA Finding

In keeping with its duty under ICWA, the juvenile court inquired of the parents at the detention hearing whether they had any Indian heritage and conducted a more thorough inquiry at the 18-month review hearing. The parents and the maternal grandmother stated they did not have any Indian heritage. Father provided the names of extended family members (his mother, brother and sisters) and contact information for two of them. The juvenile court directed the department to conduct a more thorough inquiry by contacting the extended family members, to complete notices if required and to document its inquiry efforts and results in its next report. Based on the information it had at that point, the court found ICWA did not apply to the children. It found ICWA may apply to N.P. based on mother's statement Ruben had Indian heritage.

Father contends the department's ICWA inquiry was inadequate and the matter should be remanded for "proper investigation as to [f]ather's relatives who may know

22.

more information as to the potential Indian ancestry of [f]ather … as well as a full investigation as to [m]other[']s heritage." Father does not explain, however, how the juvenile court abused its discretion in finding ICWA did not apply when, based on its inquiry, it determined there was no reason to believe the children were Indian children and it directed the department to continue the inquiry by contacting the extended family members identified, asking them if they had any Indian heritage and documenting the results of their inquiry. We find no abuse of discretion in the juvenile court's finding ICWA does not apply to the children under the facts of this case. Further, to the extent father asserts that the ICWA inquiry was inadequate because the department failed to inquire about Ruben's Indian heritage, he fails to show he has standing to raise the issue since N.P. is not his child.

We find no error on this record.

## DISPOSITION

The petition for extraordinary writ is denied. This court's opinion is final forthwith as to this court pursuant to rule 8.490(b)(2)(A).