Filed 6/5/23 M.C. v. Superior Court CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| M.C. et al., | |
| Petitioners, | E081036 |
| v. | (Super.Ct.No. SWJ2100367) |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | OPINION |
| Respondent; | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ. Michael J. Rushton, Judge. Petitions denied.

Colleen Crowley for Petitioner, M.C.

Daniel L Vinson for Petitioner, G.A.

No appearance for Respondent.

1

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Catherine E. Rupp, Deputy County Counsel, for Real Party in Interest.

INTRODUCTION

Petitioner M.C. (mother) filed a petition for extraordinary writ pursuant to California Rules of Court, rule 8.452, challenging the juvenile court's order terminating reunification services as to her children, A.A., B.A., I.C., A.C., and L.C. (the children), and setting a Welfare and Institutions Code[1] section 366.26 hearing. She contends the Riverside County Department of Public Social Services (DPSS) did not provide her with reasonable services since it left the decision to attend visits completely up to the children and because conjoint therapy never occurred. Mother also argues the juvenile court erred in not returning the children to her on family maintenance at the 18-month review hearing. Petitioner G.A. (father) has filed a separate writ petition similarly arguing that DPSS did not provide reasonable services since it left the decision to visit him and participate in conjoint therapy up to his children, A.A. and B.A. He also contends the court erred in finding that placement of his children with him would create a substantial risk of detriment. We deny the writ petitions.

PROCEDURAL BACKGROUND

On July 23, 2021, DPSS received an immediate response referral alleging that police found mother and the children in a drainage ditch, and that the family had apparently slept in the dirt. The children were dirty and had no shoes, and mother

---

[1] All further statutory references will be to the Welfare and Institutions Code unless otherwise indicated.

2

claimed that people were following her. The police gave the family a ride home, where they discovered that the home was filthy with "old food all over the home." It was reported that "some food containers have maggots. One of the bathrooms overflowed. There are bottles of urine in the rooms." Mother did not know where she had left her car. The Community Behavior Health Assessment Team was called to assess mother, and she was placed on a section 5150 psychiatric hold "for being gravely disabled and a danger to others."

On July 27, 2021, DPSS filed a section 300 petition, alleging that the children came within the provisions of subdivisions (b) (failure to protect) and (g) (no provision for support). At that time, A.A. was 10 years old, B.A. was nine years old, I.C. was six years old, A.C. was five years old, and L.C. was four years old. The petition specifically alleged that mother had unresolved mental health issues, which resulted in her being placed on a section 5150 psychiatric hold. The petition also alleged that father was not a member of his children's household, and his current whereabouts were unknown.

The social worker filed a detention report and stated that she went to the family's home with the police on July 23, 2021. The police said mother and the children left the home about three nights prior and went to a hotel because a neighbor was threatening them. Their vehicle broke down, and they left it somewhere in Murrieta. The officer said A.A. told him mother said they could not return home because someone had poisoned the home, and there was blue air coming out of the vents that would make them all pass out. The social worker reported that A.C., Sr. (or Arthur C.), the father of I.C., A.C., and L.C., was deceased.

3

The court held a detention hearing on July 28, 2021, and detained the children in foster care. The court found father to be the presumed father of A.A. and B.A., and Arthur C. to be the presumed father of the other children. The court ordered supervised visitation, twice a week, for one hour a visit.

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report on August 16, 2021, recommending the court sustain the petition, adjudge the children dependents of the court, and provide mother and father with reunification services. The social worker reported that several attempts were made to locate and contact father by text, phone calls, and Facebook, and he eventually responded and confirmed he would be present at the jurisdiction/disposition hearing.

The social worker further reported that the children were placed in the home of the paternal cousin, who confirmed that it was her understanding that Arthur C. was the biological father of I.C., A.C., and L.C., and father was the biological father of A.A. and B.A. She reported that there was never any contact between father and his children. The paternal cousin stated that Arthur C. met mother when A.A. and B.A. were very young, and they both considered him to be their father. The social worker met with A.A. to discuss paternity, and she said her father was "Arthur [C.]." She said she had a "first dad," but did not know who he was. The social worker also met with B.A., and he said his father is "Arthur" and noted his father passed away a year ago. B.A. denied he had any other fathers.

4

The social worker reported that mother was engaging in regular in-person visits, and she was also afforded three 30-minute phone calls a week. The social worker noted that mother stated she was not in need of any reunification services, and she wanted the case dismissed.

The court held a jurisdiction hearing on August 19, 2021, with both mother and father present. The social worker filed an amended section 300 petition that day. The amended petition deleted a few of the factual allegations under section 300, subdivision (b), and the allegations under subdivision (g). The remaining allegations stated that mother had unresolved mental health issues, which resulted in her being placed on a section 5150 hold, but she was not under a doctor's care or taking medication. It also alleged that she neglected the health, safety, and well-being of the children in that the family residence was found in a deplorable, unsafe, and unsanitary condition. The petition contained no allegations regarding father. The court sustained the amended petition, removed the children from parental custody pursuant to section 361, subdivision (c)(1), and ordered reunification services for mother and father. As to mother, the court ordered the prior visitation orders to remain in effect. As to father, the court ordered supervised visitation, twice a week, for one hour each visit. It authorized DPSS to liberalize visits if deemed appropriate. The case plan required mother to undergo a psychological evaluation, attend general counseling, and complete a parenting education program. The case plan required father to attend general counseling, complete a parenting education program, and participate in conjoint family therapy.

5

*Six-month Status Review and Section 388*

On November 22, 2022, mother filed a section 388 petition, requesting the court to return the children to her care on family maintenance, or in the alternative, order a trial visit or unsupervised weekend visits, with the goal of transitioning to family maintenance. DPSS opposed the request.

The court held a hearing on December 21, 2021, and continued the matter to January 12, 2022. As to father, the court ordered supervised visits, twice a week, as well as one 15-minute supervised phone call per week, per child. As to mother, it ordered supervised phone calls with all the children, collectively, twice a week. The court ordered the children's wishes be taken into consideration regarding visitation with both parents. The court also authorized conjoint therapy for mother when deemed appropriate by the children's therapist.

That day, the social worker filed a copy of mother's psychological evaluation report, as well. Mother completed an evaluation with Dr. Kenneth Garrett on September 18, 2021. Dr. Garrett reported that mother was placed on a section 5150 hold and hospitalized after she and the children were found in a drainage ditch. However, she told Dr. Garrett that she recently moved into a new neighborhood, and that "the teenagers in the home" tied up her older daughter and touched her, and they were "rough" with the other children. She said the children were scared, so she decided to go to a motel for a few days to get away. Mother did not explain why they slept in a drainage ditch. When Dr. Garrett discussed her involuntary hold with her, mother gave him the impression that there was a misunderstanding, and there was no real reason to hospitalize her. Mother

6

did not discuss the deplorable conditions of her home. She did not believe she had any mental health problems, which Dr. Garrett said was implausible. Mother's testing indicated she may have an unspecified personality disorder. When asked about her worst failing, mother said, "I'm perfect." Dr. Garrett opined that mother needed to see a licensed counselor.

Mother met with Connie Thomas, LMFT, for several sessions from October 2021 to November 2021. Ms. Thomas opined that the death of the younger children's father and the pandemic could have led to mother allowing her home to "fall into such disarray," and mother and the children leaving the home, prior to her being put on a psychiatric hold. Ms. Thomas opined that mother had already, and would continue to, benefit from participating in psychotherapeutic services that addressed the reasons why the children were brought before the court.

The social worker filed an addendum report and stated that on September 23, 2021, the children were placed in the home of paternal aunt E.C. The social worker further reported that on September 28, 2021, mother's visits were scheduled weekly, and she had six visits during the period from the end of September to the beginning of December. During a visit on December 1, 2021, B.A. asked mother to tell him about his father, and mother replied that there was nothing good she could tell him. Then, mother asked the caregiver about future visits, and when the caregiver told her to contact the social worker, mother became angry and said the social workers were "planting things in her children's head and telling them lies." At the end of the visit, the older children

7

allegedly said they no longer wanted to attend any visits as their mother "makes up stories."

On December 22, 2021, the social worker spoke to father about scheduling visits with the children. He agreed to telephone visits at first, then video visits, and in-person visits, when the children were ready. On January 4, 2022, father said he was enjoying his phone visits, and the children were ready for in-person visits. Thus, the social worker scheduled a visit for January 11, 2022.

The social worker reported that mother's unstable mental health was still a concern. She was also concerned about the children's emotional health, as they would be upset after visits with mother. The social worker noted that all the children, except for A.C. had begun weekly therapy.

On January 7, 2022, mother visited the children. B.A. asked mother about his father and said his father seemed like a good guy, but mother responded that B.A. was a liar. B.A. said he wanted to know about his father, and mother shut him down. The visit ended early because B.A. asked to go home. At a subsequent makeup visit on January 8, 2022, mother told B.A. that his father was "a bad dad" and that he (B.A.) was the reason the children could not go home. B.A. told the social worker he did not want to visit mother anymore.

On January 12, 2022, a hearing was held on the section 388 petition, and DPSS requested a continuance due to recent Covid exposure. The Court ordered all children be enrolled in therapeutic services and ordered conjoint therapy when deemed appropriate by the children's therapist.

8

On January 27, 2022, the children called the social worker to report that a few days before the children were detained, mother drove all the children to a park and made them all get out of the car, except for A.C. Mother made A.C. take off all his clothes. B.A. looked inside the car and saw mother on top of A.C. They were in the van for approximately an hour, and when they came out, A.C. had blood on his cheek and lips.

The social worker filed a six-month status review report on February 3, 2022, and reported that mother had completed most of her case plan, but did not seem to be benefitting from her services and had not addressed her mental health issues. The social worker opined that mother had not taken responsibility for the conduct that brought the children to DPSS's attention. Mother minimized her children's feelings and blamed the caregiver for the children not wanting to visit her. The children reported they did not feel safe returning to mother's care and reported they did not want her to do "bad things" again. Father completed a parenting program, was attending therapy, and was waiting for the children to attend conjoint therapy.

The court held a hearing on February 17, 2022, and continued the matter of the contested six-month review. It authorized conjoint therapy between father and A.A. and B.A. The court also considered the section 388 petition and found the issues moot. A letter from mother's therapist, Ms. Thomas, was submitted indicating she continued to meet with mother to discuss the issues that brought her to the attention of the court. Mother acknowledged that she made poor choices on the day in question, in an effort to protect her children from perceived harm.

The court held a contested six-month review hearing on February 22, 2022, and continued services. The court ordered DPSS to have the children participate in conjoint therapy with mother and father, as soon as a therapist thought it was appropriate for the children. The court also authorized supervised visitation for the parents of two times a week for one hour, and two phone calls a week for 15 minutes each call. The court ordered that the children's wishes were to be taken into consideration and encouraged DPSS to increase the visits when appropriate, if the children were willing to participate.

The social worker filed an addendum report on March 18, 2022, and reported that after a scheduled Zoom call, father called the social worker to complain that his children refused to visit with him. Father said he felt they were being brainwashed by the caregivers since they had made a complete turnaround since the initial visits, and he wanted them moved from the current caregivers.

The social worker reported that mother had a Zoom call visit with the children on March 9, 2022, that was supervised by the social worker. A.A., B.A., and A.C. said they did not want to visit and walked off the screen. I.C. said she did not want to visit because she was scared, remembering that mother put her finger down her (I.C.'s) throat. Only L.C. visited with mother. Mother read her books and showed her toys in her bedroom. At one point, the caregiver asked the social worker to ask mother not to show L.C. toys, since L.C. cried after the last visit since she did not have the toys; L.C. then said, "I don't want mom to touch my throat and make me throw up."

On March 9, 2022, the social worker met with A.A. and B.A. A.A. said she did not want to talk to father anymore because, at their last in-person visit, he forced them to

eat something they did not like. She appeared to be referring to a visit on January 25, 2022, when father suggested the children meet him at Chick-fil-A, which they indicated they did not like. A.A. and B.A. asked for McDonald's. They agreed to meet at McDonald's, and father appeared with Chick-Fil-A. They tried the food and told father they did not like it. A.A. also said she did not want to visit with father anymore because she felt uncomfortable when she spoke with him. A.A. said she did not want to visit with mother anymore because she made them do things she did not want to do, and she did not want to go back home with her, since mother "did a lot of weird things." She said mother used to fill up a cup with ice and water, pour it over her head, and say it was holy water.

B.A. said he wanted to "pass" on visits and phone calls with father. He felt that father just felt "sorry for himself," as he would tell them that he felt sad being separated from them. B.A. also said he did not feel safe or comfortable with mother, as she would tell him she had "visions" of him coming home, and it made him afraid she was going to come to his school and take him. He said, "My mom thinks she's God and sees visions."

The social worker spoke with I.C. as well, and she said she was scared to go with mother because of things she did, like making the children pee in a bottle. I.C. said mother lies and thinks "she has power and is God." A.C. said he did not want to visit mother because she had "put her finger down his throat." He added that mother said he had "the devil seed" and "did bad things to them."

On March 15, 2022, mother had a visit scheduled at the park, supervised by the social worker. The caregiver brought the children, but when the social worker asked them to exit the car, the four oldest children said they did not want to visit; only L.C.

11

wanted to visit. The social worker asked them to visit with their mother and said they could leave at any time, but they all refused except L.C. who visited with mother. The next day, mother had another Zoom call visit; the four older children refused to visit, but L.C. stayed on the call.

On March 17, 2022, the father arrived at the park for a supervised visit with A.A. and B.A.; A.A. refused to stay, but B.A. stayed. At one point B.A. asked his father if they could race. Although he was not wearing appropriate shoes, father ran with him, but father asked the social worker if B.A. was really going to run with him, to which B.A. responded, "If I'm going to live with you, you're going to have to get used to this." B.A. and father then had a disagreement, and B.A. got upset and asked if he could go home.

The social worker attached a letter from the therapists of four of the children. The therapists opined that mandated visits with mother were not benefitting the children at that time and were "potentially retraumatizing them." They stated that visits were harming the children emotionally, and they were having physical reactions before each visit. B.A. would start kicking and screaming at his siblings, A.A. and I.C. would start feeling sick, scared, and sad, and A.C. tended to get in trouble at school the day before a visit. The therapists stated that the children had not had enough time to heal from traumatic events of the past.

In April 2022, A.A. continued to state that she did not feel safe with mother. B.A. and I.C. refused to visit with mother. The therapist for I.C. and L.C. said they were doing well in therapy, but they were not ready for conjoint therapy with mother, as it would be more harmful than helpful at that time. The therapist for A.A. and B.A. reported that

12

they were slowly opening up to her. However, A.A. refused to speak about mother at their sessions, and B.A. was angry with mother. The therapist did not think they were ready for conjoint therapy, since they both continued to refuse to visit with mother.

On April 18, 2022, father demanded to begin conjoint therapy with his children, and when he was told that their therapist did not believe they were ready, father canceled the visit for the following day. B.A. and A.A. told the social worker they did not want to visit in person with father, and they quickly ended Zoom visits. B.A. said his sibling's father raised him, but "now he's dead," and now his biological father has come into his life, and he did not know him. A.A. said she felt ignored by father at one of their visits, and she did not want to give him another chance.

In May 2022, the social worker continued to set up Zoom call visits with mother and appear to supervise in-person visits, but the children continued to refuse to visit with her, except for L.C. and A.C., who sometimes opted to visit. As to father, Zoom call visits were set up, but A.A. and B.A. continued to refuse to talk to him. The social worker would encourage them to stay on the call, but they would walk away, saying they were uncomfortable. Father told the social worker he wanted to discontinue all visits "until the children are on board to continue the visits." As to conjoint therapy, all the children's therapists told the social worker it was too soon.

In June 2022, the children consistently refused to attend Zoom visits with mother; L.C. opted to participate in in-person visits, while the rest of the children declined. When asked why they did not want to visit, A.A. said it was because of what mother had done to her in the past, and the other children said it was because mother had stuck her finger

13

down their throat and because they were not happy with how they had been treated in the past. The children continued to refuse to visit with mother throughout Summer 2022, although L.C. occasionally opted to visit with mother. The social worker continued to ask A.A. and B.A. why they did not want to visit father and tried to get them to visit, but A.A. and B.A. consistently refused. DPSS was working with A.A. and B.A. and their therapists to find the most effective way for them to begin a relationship with their father. According to their therapists, the children were still not ready for conjoint therapy with either parent.

On June 16, 2022, the court authorized DPSS to liberalize visits between mother and the children. The court also ordered a psychological evaluation for B.A. and A.A., set father's visitation at once a week, and ordered DPSS to inquire weekly about their visit with father. The court ordered conjoint therapy when deemed appropriate and ordered "DPSS to continue to ensure that this order is fulfilled and to keep counsel updated on progress." The court stated that if conjoint therapy has not started by the next hearing, a report from the therapist explaining why it was not appropriate was requested.

*Twelve-month Status Review*

The social worker filed a 12-month status review report on August 5, 2022, recommending that services be continued and that mother's phone/video call visits be suspended. The social worker reported that A.A. and B.A. completed their psychological evaluations with Dr. Garrett. Dr. Garrett opined that A.A. was "living in a bizarre environment where the mother manifested bizarre behaviors such as spending the night outdoors, a poorly kept home, and bizarre satanic-like rituals." A.A. was afraid of

14

mother and was possibly suffering from Posttraumatic Stress Disorder (PTSD). A.A. showed no interest in bonding with father. As to B.A., Dr. Garrett stated that he "should be given the option to not have any contact with his mother whatsoever, until he feels prepared to do so, as the constant visitations bring back his angry feelings."

I.C.'s therapist, A.C.'s therapist, and L.C.'s therapist continued to state that their respective patients were not ready for conjoint therapy. In August 2022, B.A.'s therapist reiterated that B.A. was not ready for conjoint therapy. He said B.A. continued to express that he wanted nothing to do with his parents, and that forcing him to visit was doing more harm than good. In September 2022 and October 2022, the children's therapists continued to state they were not ready for conjoint therapy with mother or father.

As to mother's visits, the social worker summarized that mother had 31 consistently scheduled Zoom visits from March 2022 to August 2022, and all the children refused to stay on the call. During those months, there were three calls when L.C. stayed on the call. There were five in-person visits when none of the children stayed for the visit, and there were 12 visits when L.C. stayed for the visit. In September 2022, the children refused Zoom and in-person visits with mother, although L.C. occasionally participated in Zoom visits.

As to father's visits, the social worker reported that from March 2022 to April 2022, he had eight scheduled Zoom visits that B.A. and A.A. refused to participate in, even though they were encouraged to participate. The social worker also continued to ask them to visit with father in person, and they refused.

15

The social worker continued to facilitate Zoom call visits and go to the caregiver's home to transport the children to visits with mother in August 2022 and September 2022. However, the children refused to visit with mother, and A.A. and B.A. continued to decline visiting father, even though the social worker continued to encourage visits.

As to the parents' reunification services, the social worker reported that mother began seeing a new therapist, Valerie Fluker, in August 2021, but repeatedly failed to sign a release of information that would allow DPSS to receive an update regarding her therapy. The social worker opined that although mother completed most of her case plan, she had not benefited from her services. She continued to deny her involvement in what caused her family to come to the attention of the DPSS. The social worker reported that father successfully completed his individual counseling on June 24, 2022.

The court held a contested 12-month review hearing on December 7, 2022, and continued the parents' reunification services and set an 18-month review. The court ordered visits for mother to be supervised, twice a week for one hour each, or once a week for two hours; it suspended video call visits since the children had been refusing to participate, but authorized one call a week, if they were willing to participate. As to father, the court ordered visits to remain once a week for two hours, with the children's wishes to be taken into consideration.

*Eighteen-month Status Review*

The social worker filed an 18-month status review report on January 9, 2023, and recommended that the court terminate reunification services and set a section 366.26 hearing, with adoption as the permanent plan. The social worker spoke with A.A.'s

16

therapist, who consistently asked A.A. why she refused to visit mother, and A.A. said she did not feel that mother had changed or taken responsibility for what happened since she continued to blame others and did not think she did anything wrong. The therapist reported that A.A. was "closer" to conjoint therapy, but still not quite there. As to father, A.A. explained that "her father was not present for many years" and she did not want a relationship with him now. A.A. felt her father was dismissive of her feelings due to her age, because she told him she was uncomfortable and he said she was too young to know what the word "uncomfortable" meant. She said she did not want to visit him if he was going to dismiss her and not believe her.

The social worker spoke with B.A.'s therapist on January 5, 2023. The therapist reported that B.A. refused to visit or speak with either parent, and that B.A. would be traumatized if he was forced to visit mother since he had "continuously stated he doesn't want to visit" and there was nothing anyone could do to change his mind at that time. The therapist said he encouraged B.A. to visit or speak to his father, but B.A. said, "he has no feelings for 'George' because he doesn't know him." His therapist opined that if B.A. were forced to visit, "it could cause resentment." As to conjoint therapy, the therapist said it depended upon B.A.'s willingness to participate and "there [was] no timeline" for when it could begin since "it needs to come from [B.A.]" or it would not be beneficial.

I.C.'s therapist reported that I.C. met her treatment goals, and although she expressed some affection for mother, she talked more freely when mother was not around and "used to show more fear when she would be forced to see her mother." The therapist

17

stated it would be detrimental to force I.C. to visit mother since she did not wish to visit. The therapist also did not believe conjoint therapy would be beneficial.

A.C.'s therapist reported that when asked about visiting his mother, he said "[p]eople don't change" and he did not want "his mom to do 'bad things.' " According to his therapist, A.C. was not ready for conjoint therapy.

L.C.'s therapist asked why L.C. would not visit mother, and L.C. "said she's 'scared it will happen again.' " L.C.'s therapist did not feel conjoint therapy was appropriate because she was not visiting mother.

The children continued to refuse visits with both parents in February and March 2023. The social worker made weekly contact with the children to inquire if they wanted to have phone or in-person contact with their parents. A.A. asked the social worker why she should go back home when mother had not admitted that anything happened. A.A. told the social worker she wanted her and the court to know that, when she (A.A.) previously asked mother about her "sticking her finger down their throats," mother denied it happened, but that was not true.

On March 16, 2023, the court began the contested 18-month hearing. {CT 1372} B.A. testified and denied that he had any memories of father before the case started and reported that his sibling's father (Arthur C.) was "like a dad to [him]" and he did not know he "had a different dad." He also testified that he thought Arthur C. was his dad, and he loved him, and when Arthur C. died, he "didn't want to know [he] had another father." B.A. said he cut his visits with father short because he felt uncomfortable with him. He did not want to live with father and worried that if he attended the visits, he

18

would be forced to live with him. B.A. testified that the social worker was "kind of" forcing him to visit father, and said, "I just don't want to be forced." B.A. also testified that he was not willing to participate in conjoint therapy with father. As to mother, B.A. testified that he initially had visits with her, but then after living with his aunt and seeing how she raised her kids, he figured out that the way mother raised them "was not like normal." He cited the examples that mother put her fingers down his throat, made the children sleep outside for an entire night, left them in the house in the middle of the night "telling us they were like poisoning our house," and put him in the car trunk for a whole night. B.A. said he stopped visiting her because he thought that if he kept visiting her, the social workers would make him go home with her, and he did not want to live with her.

A.A. also testified and said she stopped visiting father because he made her uncomfortable. A.A. said she was scared that if she visited father she might have to live with him. Regarding mother, A.A. said she stopped visiting her after she "realized all the bad things that [mother] did to [her]." A.A. said she was not open to going to therapy with mother. When the court asked A.A. why mother did things to the children that were not normal, A.A. said, "Because she said we were possessed."

The hearing was continued until April 3, 2023. Mother testified that she was having consistent visitation with the children when they were first removed. {RT 73, 81} She reported that she "apologized [to the children], like every visit ever since the case started." When asked what she apologized for, mother said that if she "would have made a better decision with the neighbors and not bringing them over to my house as soon as I

19

did, not knowing who [the neighbor] was, none of this would have happened." When asked why she thought her children stopped wanting to visit her, mother said they were upset that they could not come home sooner and that people said negative things about her, which caused them to question who she was. She also they were stressed out by having people watch them during the visits. Mother denied that she had a mental health episode at the start of the case. She said she did not believe she was put on a section 5150 hold "for the correct reasons" since she was not a danger to herself or anyone else. Mother denied that she ever stuck her fingers down her children's throats. The court directly asked mother why she and the children spent the night outside, and she said she met their neighbor and went to their house for a barbeque; the children played with the neighbor's children upstairs; the next week the children "started saying a lot of things that they experienced in the home." Mother said she told the police when they arrived, and they said her story was crazy and arrested her. The court summarized that mother was saying her children were removed from her because she was trying to protect them from the neighbor, and she said yes.

Mother's counsel asked that the children be returned to mother. In the alternative, she asked the court to continue services beyond the 18-month limit and argued that she did not receive reasonable services since she did not receive visits, and the children should not have been able to determine whether or not they would visit. Father's counsel asked that his children be returned to him, and if not, to continue the hearing under section 352, or continue his services because DPSS failed to provide him with reasonable reunification services since the children refused to visit and no conjoint therapy was

20

provided. Father's counsel specifically noted that father could have objected to removal at the jurisdiction hearing and argued there was no detriment, under section 361.2, since he was a noncustodial parent.[2] However, father instead agreed to have visitations "and letting things progress and going from there."

The court terminated services to both parents and articulated that it would be contrary to the children's best interest to continue the hearing under section 352. The court stated it would not make a finding that reasonable services were not provided since the evidence was to the contrary. The court stated DPSS "did everything it could to facilitate visitation." The court found that returning the children to either parent would create a substantial risk of detriment to the children's emotional well-being. The court remarked that mother was "exactly where she was today as when we held the jurisdiction disposition hearing in this case, which is zero insight, folks." Regarding father, the court pointed out that "you were out of the kids' life to the point where they had no memory of you." It found that the absence of a meaningful relationship with father during their lives was "a huge underlying factor here."

The court also found by clear and convincing evidence that both parents failed to regularly participate and make adequate progress in their court-ordered case plans, and

_____

[2] Section 361.2, subdivision (a), provides: "If a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."

21

there was no substantial probability that the children may be returned if reunification services were extended. The court found that DPSS provided reasonable reunification services and set a selection and implementation hearing under section 366.26. {RT 150-153}

## DISCUSSION

I. <u>The Court Properly Ordered Visitation and DPSS Provided Reasonable Services</u>

Mother and father both argue that DPSS did not provide reasonable services since it left the decision to attend visits completely up to the children and "because conjoint therapy never occurred." Respondent argues DPSS provided reasonable services, and we agree.

A. *Standard of Review*

To support a finding that reasonable services were offered or provided, "the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . ." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.)

"In reviewing the reasonableness of the services provided, this court must view the evidence in a light most favorable to the respondent. We must indulge in all legitimate and reasonable inferences to uphold the verdict. If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545 (*Misako R.*).)

22

B. *The Court Properly Ordered Visitation*

At the outset, we note the court properly ordered visitation and did not give the children the discretion to decide whether visits would occur. "Every order placing a minor in foster care and ordering reunification services must provide for visitation between the parent and the minor as frequently as possible, consistent with the well-being of the minor. [Citation.] The court may deny a parent visitation only if visitation would be harmful to the child's emotional well-being. [Citation.] The juvenile court has the sole power to determine whether visitation will occur and may not delegate its power to grant or deny visitation to the [DPSS]. The court may, however, delegate discretion to determine the time, place and manner of the visits. Only when the court delegates the discretion to determine whether any visitation will occur does the court improperly delegate its authority and violate the separation of powers doctrine." (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1008-1009 (*Christopher H.*).) The discretion to determine whether visitation occurs must remain with the court, not with social workers, therapists, or the dependent child. (*In re S.H.* (2003) 111 Cal.App.4th 310, 317 (*S.H.*).)

The court initially ordered supervised visitation for mother and father twice a week, for one hour each visit and authorized DPSS to liberalize visits if deemed appropriate. The court also ordered supervised phone/Zoom calls with the children twice a week. At the six-month review hearing on February 22, 2022, the court ordered DPSS to have the children participate in conjoint therapy with mother and father, as soon as a therapist thought it was appropriate for the children. The court continued to order supervised visitation twice a week, and two calls per week for 15 minutes each call. The

23

court ordered that the children's wishes be taken into consideration and encouraged DPSS to increase the visits when appropriate, if the children were willing to participate. Notably, there was no delegation of judicial power to the children. (See *In re Danielle W.* (1989) 207 Cal.App.3d 1227, 1237 (*Danielle W.*) [court found that visitation order was not an improper delegation of power, even though the order stated that visitation was, in part, at the children's discretion].)

We acknowledge that although the court made proper visitation orders, the children started out visiting the parents, but eventually refused to visit. However, *the court* never gave the children the discretion to refuse visits. (See *Christopher H.*, *supra*, 50 Cal.App.4th at p. 1009 [the court cannot delegate its discretion to determine whether any visitation would occur].) Notably, a juvenile court is not required to force a child to visit a parent against his or her will. (*Danielle W.*, *supra*, 207 Cal.App.3d at pp. 1237-1238.)

Both mother and father cite cases such as *S.H.*, *supra*, 111 Cal.App.4th at pp. 317-318, to argue that courts "have long held that children should not be allowed to control whether visitation occurs." However, the visitation order here was not similar to the one in *S.H.*, where the court reversed a court's order which explicitly stated that " 'if the children refuse a visit, then they shall not be forced to have a visit.' " (*Id.* at p. 313.) Further, the order failed to mandate any minimum number of monitored visits a month, or even to order that some visitation must occur each month. (*Id.* at p. 319.) In contrast, here, the court's order stated that supervised visitation was to be a minimum of two times

a week.[3]  The court also ordered supervised visitation twice a week, and two calls a week for 15 minutes each call.

We conclude that the court's visitation orders were proper, as the court did not delegate its discretion to determine whether any visitation would occur.  (See *Christopher H.*, *supra*, 50 Cal.App.4th at p. 1009 ["Only when the court delegates the discretion to determine whether any visitation will occur does the court improperly delegate its authority and violate the separation of powers doctrine."].)

C.  *DPSS Provided Reasonable Services with Regard to Visitation and Conjoint Therapy*

We further find the claim that DPSS did not provide reasonable services because it left the decisions to visit and to participate in conjoint therapy "completely up to the children" unavailing.  "The adequacy of reunification plans and the reasonableness of [DPSS's] efforts are judged according to the circumstances of each case.  [Citation.] Moreover, [DPSS] must make '[a] good faith effort to develop and implement a family reunification plan.' " (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.)

The record demonstrates that DPSS made reasonable efforts to provide visits.  As the court recognized, DPSS "did everything it could to facilitate visitation."  The record shows that the social worker scheduled visits weekly, and mother and father visited with the children, in person and by Zoom/phone, at the beginning of the dependency. The children began refusing to visit with both parents, either in person or on the Zoom calls,

---

[3]  We note that the court later set father's visitation at once a week, and ordered DPSS to inquire weekly about their visit with father.

25

and the social worker did not force them to visit. However, the social worker was simply following the court's order that the children's wishes were to be taken into consideration. The social worker persisted in asking and encouraging the children to visit, setting up Zoom calls, and going to the caregiver's home to transport them to visits, even though they continuously refused to visit with mother and father.[4] Up until the 18-month review hearing, the social worker made weekly contact with the children to inquire if they wanted to have phone or in-person contact with their parents.

Furthermore, the social worker properly considered the children's feelings and did not force them to visit. "[T]he parents' interest in the care, custody and companionship of their children is not to be maintained at the child's expense; the child's input and refusal and the possible adverse consequences if a visit is forced against the child's will are factors to be considered in administering visitation." (*S.H.*, *supra*, 111 Cal.App.4th at p. 317.) On one occasion when the social worker asked the children why they did not want to visit, A.A. said it was because of what mother had done to her in the past, and the other children said it was because mother had stuck her finger down their throat and because they were not happy with how they had been treated in the past. A.C. said he did not want to visit mother because she had "put her finger down his throat," and she said he had the "devil seed" and "did bad things to them." When asked why she would not visit mother, L.C. "has said she's 'scared it will happen again.' "

_____

[4] We note there were some visits with mother when L.C. stayed for the in-person visits and stayed on the calls.

26

B.A. and A.A. told the social worker they did not want to visit in person with father, and they quickly ended Zoom visits. B.A. said his sibling's father raised him, but "now he's dead," and although his biological father had come into his life, he did not know him. A.A. said she felt ignored by father at one of their visits. She felt her father was dismissive of her feelings and did not want to visit if he was going to dismiss her and not believe her.

Notably, professionals who worked with the children advised that they should not be forced to visit mother and father. For example, Dr. Garrett opined that B.A. "should be given the option to not have any contact with his mother whatsoever, until he feels prepared to do so, as the constant visitation brings back his angry feelings." Dr. Garrett noted that A.A. was "living in a bizarre environment where the mother manifested bizarre behaviors such as spending the night outdoors, a poorly kept home, and bizarre satanic-like rituals." He assessed that A.A. was afraid of mother and was possibly suffering from PTSD, and that she showed no interest in bonding with father. Two other therapists opined that mandated visits with mother were not benefitting the children and were "potentially retraumatizing them." They observed the visits were harming the children emotionally, and the children were having physical reactions before each visit. The therapists stated that the children had not had enough time to heal from traumatic events of the past.

In August 2022, B.A.'s therapist said B.A. continued to express that he wanted nothing to do with his parents and that forcing him to visit was doing more harm than good. The therapist subsequently reported that B.A. would be traumatized if forced to

27

visit mother since he had "continuously stated he doesn't want to visit" and there was nothing anyone could do to change his mind at that time. The therapist reported B.A. said, "he has no feelings for 'George' because he doesn't know him." The therapist opined that if B.A. were forced to visit, "it could cause resentment."

Thus, despite DPSS's reasonable attempts to facilitate visitation, the children refused to visit. Visitation must be "consistent with the well-being of the child." (§ 362.1, subd. (a)(1)(A).) Here, DPSS actively sought to facilitate visitation. Short of physically coercing the children, there was little more DPSS could do to accomplish its obvious objective of visitation between the parents and the children.

Similarly, DPSS could not force the children to participate in conjoint therapy. The court ordered all children be enrolled in therapeutic services and ordered conjoint therapy with mother and father when deemed appropriate by the children's therapist. The therapists met with the children and consistently reported that they did not think the children were ready for conjoint therapy with either parent. B.A.'s therapist specifically said conjoint therapy depended upon B.A.'s willingness to participate and "there [was] no timeline" for when it could begin, since "it would need to come from [B.A.]" or it would not be beneficial.

In sum, "[t]he standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*Misako R.*, *supra*, 2 Cal.App.4th at p. 547.) Construing all reasonable inferences in favor of the juvenile court's findings regarding the reasonableness of

28

DPSS's efforts, as we must, we conclude the services provided to mother and father were reasonable under the circumstances. (*Ibid*.)

## II. The Court Properly Found That Return of the Children with Either Parent Would Create a Substantial Risk of Detriment

Mother argues the court committed reversible error in finding it would be detrimental to return the children to her care at the 18-month review hearing, and that it should have returned them to her on family maintenance. Father similarly contends that the court erred in finding that placement of A.A. and B.A. with him would create a substantial risk of detriment. We conclude the evidence was sufficient to support the court's finding of detriment.

### A. *Relevant Law*

"The Legislature has determined the juvenile court may generally offer family reunification services for a maximum period of 18 months. [Citations.] At the 18-month permanency review hearing the juvenile court must order a child returned to a parent's custody unless it finds, by a preponderance of the evidence, that return of the child will create a substantial risk of detriment to the child's safety, protection or physical or emotional well-being." (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 864, fn. omitted; see § 366.22, subd. (a).) "The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§ 366.22, subd. (a)(1).) If the child is not returned to a parent at the permanency review hearing, the court must

29

terminate reunification services and order a hearing pursuant to section 366.26. (§ 366.22, subd. (a)(3).)

"The juvenile court's detriment finding is reviewed under the substantial evidence standard." (*In re A.J.* (2015) 239 Cal.App.4th 154, 160.) "[T]he reviewing court must determine if there is any substantial evidence, that is, evidence which is reasonable, credible, and of solid value to support the conclusion of the trier of fact. [Citation.] In making this determination, all conflicts are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.] In dependency proceedings, a trial court's determination will not be disturbed unless it exceeds the bounds of reason." (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564 (*Ricardo L.*)

B. *The Court Properly Found That Return of the Children to Mother Would Be Detrimental to Their Emotional Well-Being*

Mother contends "substantial evidence does not exist" that return of the children to her care would create a substantial risk of detriment. We disagree.

Section 366.22 provides that "[t]he failure of the parent . . . to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§ 366.22, subd. (a)(1).)

Mother asserts that she had stable housing and employment and completed her case plan. However, the mere completion of a case plan is not sufficient to have a child returned to a parent, as the court is required to "consider the efforts or progress, or both, demonstrated by the parent . . . and the extent to which [she] . . . availed [her]self of

30

services provided." (§ 366.22, subd. (a)(1); see *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1139-1141.) The social worker opined that even though mother had completed 18 months of services, she had not made substantive progress as she continued to deny the allegations that brought her and the children to DPSS's attention. Thus, the social worker recommended that the court find return of the children to her care would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the children.[5] The court agreed and found that mother failed to make adequate progress in her case plan, and that returning the children to her would create a substantial risk of detriment to the children's emotional well-being. It stated that mother was "exactly where she was today as when we held the jurisdiction disposition hearing in this case, which is zero insight."

The evidence supported the court's finding. At the beginning of the case, mother thought there was no real reason to hospitalize her, never explained why she and the children slept in a drainage ditch, did not believe she had any mental health problems, did not acknowledge the deplorable conditions of her home, and told Dr. Garrett she was "perfect." By the time of the 18-month hearing, mother still denied that she had a mental health episode at the start of the case. She believed the children were removed from her because she was trying to protect them from the neighbor, and that she was arrested because the police thought her story about the neighbor harming her children was crazy. When the court asked why she and the children slept outside, mother had no explanation.

---

[5] Contrary to mother's claim, DPSS did not rely on the children's refusal to visit as a basis for its recommendation to terminate services. {MW p. 18}

She denied that she ever stuck her fingers down her children's throats and could not explain why they were saying she did that. Mother did not believe she was put on a section 5150 hold "for the correct reasons," since she was not a danger to herself or anyone else. Further, when asked why she thought the children stopped wanting to visit her, she said they were upset that they could not come home sooner and that people said negative things about her, which caused them to question who she was. She also said they were stressed out by having people watch them during the visits. Mother clearly had not gained any insight into the reasons for removal or her children's feelings.

Moreover, the evidence showed the children were traumatized by how mother treated them. They reported that they did not feel safe returning to her care and did not want her to do "bad things" again. A.A. said mother "did a lot of weird things." For example, mother used to fill up a cup with ice and water, pour it over her head, and say it was holy water. A.A. said mother did strange things because she thought "[they] were possessed." I.C. said mother made the children pee in a bottle and said mother lies and thought "she ha[d] power and [was] God." A.C. said mother "put her finger down his throat," and said he had "the devil seed." B.A. testified that mother put her fingers down his throat, made the children sleep outside for an entire night, left them in the house in the middle of the night "telling us they were like poisoning our house," and put him in the car trunk for a whole night. The children's therapists recognized that the children needed time to heal from mother's bizarre conduct and opined that they were not ready to engage in conjoint therapy with her.

In light of the evidence, we cannot say the court's determination that return of the children to mother's care would create a risk of detriment to their emotional well-being exceeded the bounds of reason. Therefore we will not disturb its determination. (*Ricardo L.*, *supra*, 109 Cal.App.4th at p. 564.)

C. *The Court Properly Found That Return of the Children to Father Would Be Detrimental to Their Emotional Well-being*

Father asserts that he completed his case plan, had a suitable home for the children, had a job, and "made every effort to visit the children and consistently requested to visit the kids and begin conjoint counseling." He also notes that A.A. and B.A. were not afraid of him and "thought he was a nice guy." Father mentions two specific "negative interactions" he had with them during his visits, but states they were "simply typical parent child interactions." He additionally claims the court "made assumptions, without evidentiary support, that there would be a substantial risk of emotional detriment because of the lack of visits and conjoint [therapy], and because the children's first choice was to live with their aunt." We conclude there was sufficient evidence to support the court's finding of detriment.

Assuming father's assertions about his case plan, job, housing, etc. are true, the evidence still supports the court's finding that return to father's care would be detrimental to A.A.'s and B.A.'s emotional well-being. It is apparent to us that father was certainly diligently trying to regain custody of his children. However, contrary to his claim, the court did not make assumptions that "there would be a substantial risk of emotional detriment because of the lack of visits and conjoint [therapy], and because the children's

33

first choice was to live with their aunt." Rather, the court based its finding of detriment largely on the absence of a meaningful relationship with father during his children's lives. The evidence showed that prior to their removal from mother's care, he had no relationship with his children. Mother met Arthur C. when A.A. and B.A. were very young, and they both considered him to be their father. B.A. said Arthur C. raised him and that he had no feelings for father because he did not know him. At the 18-month hearing, B.A. testified that he had no memories of father before the case started. He further testified he thought Arthur C. was his dad and he loved him, and when Arthur C. died, he "didn't want to know [he] had another father." B.A. also said he felt uncomfortable with father. He said he did not want to be forced to visit father, was not willing to participate in conjoint therapy with him, and did not want to live with him. B.A.'s therapist stated that if he were forced to visit, "it could cause resentment."

A.A. told her therapist that "her father was not present for many years and she [did] not want a relationship with him now." A.A. felt her father was dismissive of her feelings and said she did not want to visit him if he was going to dismiss her and not believe her. She said she felt ignored by him at one of their visits, and she did not want to give him another chance. At the 18-month hearing, A.A. testified that she stopped visiting because father made her uncomfortable, and she was scared that if she visited him she might have to live with him. We again note that A.A.'s and B.A.'s therapists repeatedly said they were not ready for conjoint therapy with father.

In view of this evidence, we cannot say the court's determination that return of A.A. and B.A. to father's care would create a risk of detriment to their emotional well-

34

being exceeded the bounds of reason; therefore we will not disturb its determination. (*Ricardo L.*, *supra*, 109 Cal.App.4th at p. 564.)

### III. The Court Properly Declined to Continue the Case

Finally, father argues the court should have continued his services to 24 months under section 366.22, subdivision (b), or section 352. We disagree.

As to father's claim that the court should have continued the case under section 366.22, subdivision (b), he concedes that he would have had to have been participating in a substance abuse program under section 366.22, subdivision (b)(3). Since he was not, the statute does not apply to him. (See § 366.22, subd. (b).) The court recognized as much.

As to section 352, we note that subdivision (a)(1) provides, in pertinent part: "Upon request of counsel for the parent . . . the court may continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held, provided that a continuance shall not be granted that is contrary to the interest of the minor. In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." "Continuances shall be granted only upon a showing of good cause." (§ 352, subd. (a)(2).) "[W]e reverse an order denying a continuance only on a showing of an abuse of discretion." (*In re Ninfa S.* (1998) 62 Cal.App.4th 808, 811.)

Below, the only bases of the requested continuance were "to continue to allow visitations" and "continue to make efforts to reunify the children with the father." In his

35

writ, father argues that the court should have continued the matter under section 352 "to allow for conjoint therapy."  The court here acknowledged that it had broad discretion under section 352 to continue the matter.  However, it found that DPSS did everything it could to get the children to visit with father, and stated it ultimately could not find that continuing the case would be in the children's best interest.

In view of all the evidence, we cannot say the court abused its discretion in denying the request to continue the matter beyond 18 months.  (See §§ I and II, *ante*.)

DISPOSITION

The juvenile court's orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


FIELDS _____
J.


We concur:


McKINSTER _____
Acting P. J.


MILLER _____
J.